Mills *v.* Hartford HealthCare Corp.

KRISTIN MILLS, ADMINISTRATOR (ESTATE OF
CHERYL MILLS) *v.* HARTFORD HEALTHCARE
CORPORATION ET AL.
(SC 20763)
(SC 20764)
(SC 20765)

McDonald, D'Auria, Mullins, Ecker and Seeley, Js.

*Syllabus*

The plaintiff, the administrator of the estate of the decedent, C, sought to
recover damages from the named defendant, H Co., which operates
Hartford Hospital, and the defendant physicians, R, B, D, and F, for the
allegedly wrongful death of C. In March, 2020, shortly after the onset
of the COVID-19 pandemic, C went to the emergency room at a hospital
in Norwich complaining of a sore throat and a headache. The emergency
room staff suspected that C was experiencing a myocardial infarction.
Because the Norwich hospital did not have a cardiac catheterization
lab, C was transferred to Hartford Hospital, where such facilities are
available. At that hospital, C was examined by R, an interventional
cardiologist. H Co., however, had recently modified its protocols due
to the pandemic, and patients who were suspected of having COVID-
19 were not to be admitted to the hospital's catheterization lab until
they tested negative for COVID-19, unless their physical symptoms dic-
tated the need for emergency catheterization. R was concerned that C
could have COVID-19 and doubted that she was suffering from a myocar-
dial infarction, insofar as he believed that C's symptoms were most
consistent with COVID-19 induced myocarditis or myopericarditis rather
than a myocardial infarction. Accordingly, R developed a treatment plan
pursuant to which C would be tested for COVID-19 and her admission
to the catheterization lab would be deferred pending the receipt of a
negative COVID-19 test result. A COVID-19 diagnostic test was adminis-
tered on March 21, 2020, and, while it was in process over the next
several days, B, D, and F became involved in C's care. On March 24,
2020, C's test result came back as negative. F was the only physician
responsible for C's care after the receipt of the negative test result. On
March 25, 2020, F ordered that C undergo a coronary angiogram in the
hospital's catheterization lab, but C died of a myocardial infarction
before the procedure was administered. The plaintiff alleged that the
defendant physicians, and, through them, H Co., were negligent and
grossly negligent in their treatment of C, insofar as C died after she was
misdiagnosed as having non-life-threatening myocarditis or myopericar-
ditis, when she actually was suffering from a life-threatening myocardial
infarction. The defendants moved to dismiss the plaintiff's action, claim-

Mills *v.* Hartford HealthCare Corp.

ing that they were immune from liability and suit under Executive Order No. 7V, § 6, which was issued by Governor Ned Lamont in April, 2020, and which confers on health care professionals and health care facilities "immunity from suit for civil liability for any injury or death alleged to have been sustained because of . . . acts or omissions undertaken in good faith while providing health care services in support of the [s]tate's COVID-19 response . . . ." The defendants also claimed that they were immune under the provision (42 U.S.C. § 247d-6d) of the federal Public Readiness and Emergency Preparedness Act (PREP Act) that confers immunity from suit and liability for injuries sustained as a result of the application or use of certain pandemic countermeasures, such as COVID-19 diagnostic tests. The trial court ultimately granted the motions to dismiss with respect to the claims directed at the defendant physicians' acts or omissions that occurred before the receipt of C's negative COVID-19 test result on March 24, 2020, but denied one of the motions to dismiss with respect to claims directed at acts or omissions occurring after that time. As to the immunity conferred under Executive Order No. 7V, the court reasoned that, before the negative test result was received, the defendant physicians were providing health care services in support of the state's response to the pandemic because, at that time, they had a good faith belief that they may be treating an actual COVID-19 patient, but the defendant physicians could not claim to be providing health care services in support of the state's COVID-19 response after they received the negative test result. Similarly, with respect to the immunity conferred under the PREP Act, which, unlike Executive Order No. 7V, affords immunity for gross negligence, as well as negligence, the trial court determined that the defendants were immune for only those acts and omissions, whether negligent or grossly negligent, that occurred before the receipt of the negative COVID-19 test result because they related to, and arose out of, a COVID-19 diagnostic countermeasure, namely, the administration of C's COVID-19 diagnostic test. Accordingly, because R, B, and D were not involved in C's treatment after the receipt of the negative COVID-19 test result, the court dismissed all of the claims against them, leaving F as the only remaining individual defendant based on his role in C's care after the receipt of the negative COVID-19 test result on March 24, 2020. The plaintiff, H Co., and F filed separate appeals. On appeal, the plaintiff challenged the court's dismissal of the counts directed at R, B, and D, alleging negligence before C's negative COVID-19 test result was received. H Co. and F challenge the court's decision not to dismiss the plaintiff's claims relating to acts or omissions after the receipt of the negative COVID-19 test result. *Held*:

1. The trial court correctly determined that, under Executive Order No. 7V, the defendants were immune for any negligent acts or omissions occurring before, but not after, the receipt of C's negative COVID-19 test result, and, therefore, the court properly dismissed the counts alleging negligence against R, B, and D, and properly declined to dismiss the

Mills *v.* Hartford HealthCare Corp.

count alleging negligence with respect to F's acts or omissions after the receipt of C's negative COVID-19 test result:

a. This court concluded that Executive Order No. 7V, § 6, confers immunity from suit and liability only for acts and omissions that are undertaken in good faith and in connection with the provision of health care services in support of the state's COVID-19 response, which necessarily would include those undertaken for the prevention, diagnosis, or treatment of COVID-19, and that a health care provider or facility seeking immunity under that provision is required to demonstrate a nexus between the alleged negligence and the services rendered in support of the state's COVID-19 response.

In determining the scope of the immunity conferred by Executive Order No. 7V, this court applied the usual principles of statutory interpretation in construing the language of the executive order, and, because this court determined that the provision therein conferring immunity to covered individuals and facilities for "acts or omissions undertaken in good faith while providing health care services in support of the [s]tate's COVID-19 response" was ambiguous, it looked to the circumstances surrounding the order's promulgation and to the public policy that the order was designed to implement.

When Governor Lamont issued Executive Order No. 7V, the nature of COVID-19 was poorly understood, the belief that hospitals were about to be overwhelmed was widespread, and the evident purpose of the immunity provision was to facilitate the implementation of certain policies that would augment Connecticut's health care workforce by assuring health care professionals and facilities that, in light of the uncertainties surrounding the diagnosis, treatment, and prevention of COVID-19, and in view of the compelling need to keep health care facilities open and operating, they would not be held liable for their acts and omissions undertaken in good faith and in support of the state's COVID-19 response.

In light of the language of the immunity provision and the policies that it was intended to advance, this court rejected both a narrow interpretation of Executive Order No. 7V, § 6, pursuant to which a health care provider is immune from liability and suit only for acts or omissions undertaken while treating a patient for COVID-19, and a broad interpretation, pursuant to which a health care provider is immune from liability and suit for any acts or omissions undertaken while the provider's services coincide with the effective period of the declared public health emergency, regardless of whether the acts or omissions are connected to those services, and, instead, it adopted an interpretation between those two ends of the spectrum pursuant to which immunity is conferred when the acts or omissions that caused the patient to suffer an injury are connected to the health care provider's services in support of the state's

Mills *v.* Hartford HealthCare Corp.

COVID-19 response, even if the defendant was not treating the patient for COVID-19.

This interpretation of Executive Order No. 7V, § 6, was supported by the plain language in the second part of the immunity provision, providing that the scope of the immunity includes, but is not limited to, "acts or omissions undertaken because of a lack of resources, attributable to the COVID-19 pandemic, that renders the health care professional or heath care facility unable to provide the level or manner of care that otherwise would have been required in the absence of the COVID-19 pandemic and which resulted in the damages at issue," insofar as that language plainly requires the act or omission to have a connection to the COVID-19 pandemic for immunity to apply, and construing the first part of the immunity provision to require a similar nexus between the alleged negligence and the COVID-19 pandemic created a harmonious and consistent whole.

b. The plaintiff could not prevail on her claim that the trial court improperly had dismissed the counts of her complaint alleging negligence with respect to the defendant physicians' acts or omissions occurring before the receipt of C's negative COVID-19 test result:

Notwithstanding the plaintiff's argument that, but for the defendant physicians' alleged misdiagnosis, C's COVID-19 status would have been deemed irrelevant for purposes of the plaintiff's negligence claim, and the fact that, if C had been experiencing a myocardial infarction, the defendant physicians should have promptly admitted her to the hospital's cardiac catheterization lab, the immunity conferred by Executive Order No. 7V does not turn on whether the defendant physicians' acts or omissions were negligent but, rather, on whether those acts or omissions had a connection to health care services provided in support of the state's COVID-19 response.

In the present case, the plaintiff offered no evidence to dispute the affidavits submitted by the defendant physicians, in which they attested that C's COVID-19 status was a material factor in diagnosing C and deciding on her treatment and care, the defendant physicians' reliance on the COVID-19 protocol instituted by H Co. underscored the fact that their acts or omissions, regardless of whether they were negligent, occurred in the course of providing health care services in support of the state's COVID-19 response, and the diagnosis and treatment of a patient with health care complications that the provider believed in good faith were caused by COVID-19 clearly constituted acts or omissions connected to the provision of health care services in support of the state's COVID-19 response for purposes of Executive Order No. 7V.

Moreover, there was no merit to the plaintiff's claim that Executive Order No. 7V requires an objectively reasonable belief that the health care provider's provision of services was in support of the state's COVID-

Mills *v.* Hartford HealthCare Corp.

19 response, as the immunity provision therein includes no such requirement, and the plaintiff's claim conflates the issues of immunity and liability and fails to contemplate that, in the present case, the alleged misdiagnosis of C and C's COVID-19 status were inextricably linked, insofar as the defendant physicians submitted undisputed evidence that they believed that C's symptoms were caused by COVID-19, and their treatment plan was informed by that provisional diagnosis.

c. F and H Co. could not prevail on their claims that the trial court incorrectly had determined that they were not immune under Executive Order No. 7V for F's allegedly negligent acts and omissions after the receipt of C's negative COVID-19 test result:

The receipt of C's negative test result broke any meaningful connection between F's treatment of C and his provision of health care services in support of the state's COVID-19 response because, at that point, F simply was providing treatment to a patient who, three days earlier, had received test results possibly indicating a myocardial infarction, and, although the provisional diagnosis of a possible COVID-19 infection had caused the delay in diagnosing and treating C's true condition, COVID-19 had no bearing on the nature of the health care services that were rendered after the negative test result was received, thereby rendering immunity unavailable under the terms of Executive Order No. 7V for acts and omissions occurring after that point in time.

Moreover, contrary to F's and H Co.'s claims that COVID-19 continued to bear on the nature of the health care services that F provided despite the receipt of C's negative COVID-19 test, the decisions made concerning C's care after COVID-19 had been ruled out were not dictated by the COVID-19 diagnosis but, rather were the result of learning that C did not have COVID-19 and the delay driven by suspicion of a COVID-19 induced condition having come to an end.

Furthermore, there was no merit to F's claim that he and H Co. were immune from liability because there was nothing that he reasonably could have been expected to do to prevent C's death once her negative test result was received, as that claim conflated immunity and liability, or his claim that this court's conclusion would lead to an absurd result by bifurcating the immunity analysis on the basis of whether the care F provided occurred before or after the receipt of C's COVID-19 test result, and there was nothing in the record to support the contention of H Co. that its COVID-19 protocol hampered the defendant physicians' ability to provide treatment to C after the receipt of her negative COVID-19 test result.

d. This court declined to address certain additional issues regarding the governor's statutory and constitutional authority to confer immunity from suit and liability for medical malpractice:

Mills *v.* Hartford HealthCare Corp.

Although the parties cited constitutional considerations in connection with their arguments as to the scope of immunity afforded under Executive Order No. 7V, § 6, the plaintiff did not challenge the governor's authority to confer such immunity, and, although this court ordered supplemental briefing on this issue and related issues, which were of a sufficiently public character to warrant this court's review, supplemental briefing, in light of its limitations, did not provide a sufficiently robust platform to address those issues.

Accordingly, this court assumed, without deciding, that the governor was legally authorized to confer the immunity at issue through an executive order.

2. The trial court incorrectly concluded that, under the federal PREP Act, the defendants were immune from suit and liability for their allegedly negligent and grossly negligent acts or omissions occurring before the receipt of C's negative COVID-19 test result, and, accordingly, this court reversed the trial court's decision insofar as that court dismissed the counts of the complaint alleging grossly negligent acts or omissions by R, B, and D prior to the receipt of the negative COVID-19 test result:

a. The trial court incorrectly concluded that the defendants were immune from suit and liability under the PREP Act for their conduct, including their allegedly grossly negligent acts or omissions, occurring before the receipt of the negative COVID-19 test result:

In determining whether PREP Act immunity applies, courts focus on the claims as they are pleaded in the plaintiff's complaint.

The immunity conferred by the PREP Act, as it relates to what constitutes a covered countermeasure, is narrow in scope and far less encompassing than the immunity conferred by Executive Order No. 7V, as the PREP Act does not apply to all medical services provided in an attempt to diagnose, treat, or prevent the spread of COVID-19, and, although a countermeasure under the PREP Act includes the administration of a COVID-19 diagnostic test, it does not include protocols or policies designed or implemented for the prevention or control of COVID-19, such as H Co.'s protocol with respect to the admission of patients suspected of having COVID-19 to the hospital's cardiac catheterization lab.

In the present case, the plaintiff alleged, inter alia, that the defendant physicians were both negligent and grossly negligent in failing to diagnose C with a myocardial infarction, and Executive Order No. 7V, § 6, does not confer immunity for allegedly grossly negligent acts or omissions.

The mere fact that the defendant physicians administered and used a COVID-19 test did not, in and of itself, dictate whether they should proceed with treatment while the test result was pending, and that decision was driven, rather, by the defendant physicians' provisional COVID-

Mills *v.* Hartford HealthCare Corp.

19 diagnosis and H Co.'s protocol, and there would have been no delay attributable to the defendant physicians if they had immediately diagnosed her with a myocardial infarction, despite suspecting that she suffered from COVID-19, and had immediately admitted her to the hospital's cardiac catheterization lab while the COVID-19 test result was pending, as the plaintiff alleged they should have done.

Accordingly, in light of the plaintiff's allegations in her complaint, the defendant physicians' gross negligence was not causally related to and did not arise out of the administration or use of the COVID-19 diagnostic test within the meaning of the PREP Act.

b. The trial court correctly concluded that F and H Co. were not immune from suit and liability under the PREP Act for F's allegedly negligent acts or omissions occurring after the receipt of C's negative COVID-19 test result:

In light of this court's conclusion that the PREP Act does not confer immunity from suit and liability for the allegedly negligent conduct of R, B, and D before the receipt of C's negative COVID-19 test result, the PREP Act did not afford F immunity for his allegedly negligent conduct after receipt of the test result because, if there was no allegation of any causal relationship between the administration of the COVID-19 test and the plaintiff's allegations of negligence relating to acts or omissions before the receipt of the test result for purposes of the PREP Act, the receipt of the test result could not have created such a connection.

Accordingly, the plaintiff was entitled to proceed on the counts of her complaint alleging gross negligence as to all of the defendants and the counts of her complaint alleging negligence as to F and H Co.

Argued April 27—officially released August 8, 2023*

*Procedural History*

Action to recover damages for, inter alia, the defendants' alleged medical malpractice, brought to the Superior Court in the judicial district of Hartford, where the court, *Budzik, J.*, granted the motions to dismiss filed by the named defendant et al. and the defendant Melissa Ferraro-Borgida et al. and denied the motion to dismiss filed by the defendant William J. Farrell, and the defendant William J. Farrell, the named defendant and the

* August 8, 2023, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

347 Conn. 524 AUGUST, 2023 531

Mills *v.* Hartford HealthCare Corp.

plaintiff filed separate appeals. *Reversed in part*; *further proceedings*.

*Richard A. O'Connor*, with whom, on the brief, were *Michael G. Rigg* and *Rebecca N. Brindley*, for the appellant in SC 20763 (defendant William J. Farrell).

*Wesley W. Horton*, with whom were *Brendan N. Gooley* and *Kenneth J. Bartschi* and, on the brief, *John C. Pitblado*, *Jonathan Friedler* and *Lauren Graham*, for the appellant in SC 20764 and the appellee in SC 20763 and SC 20765 (named defendant) and the appellee in SC 20763, SC 20764, and SC 20765 (defendant Asad Rizvi).

*James P. Sexton*, with whom were *John R. Weikart* and, on the brief, *Gail Oakley Pratt* and *Megan L. Wade*, for the appellant in SC 20765 and the appellee in SC 20763 and SC 20764 (plaintiff).

*Stuart C. Johnson*, with whom, on the brief, were *April H. Rosenkrantz* and *Andrew S. Wildstein*, for the appellees in SC 20765 (defendant Melissa Ferraro-Borgida et al.).

*Joshua Perry*, solicitor general, with whom were *Michael K. Skold*, deputy solicitor general, and, on the brief, *William Tong*, attorney general, for the state of Connecticut as amicus curiae.

*Jennifer L. Cox* and *Jennifer A. Osowiecki* filed a brief for the Connecticut Hospital Association as amicus curiae.

*Bryan M. Killian* filed a brief for the United States Chamber of Commerce as amicus curiae.

*Keith M. Blumenstock*, *David J. Robertson* and *Jeannine M. Foran* filed a brief for Athena Health Care Associates, Inc., as amicus curiae.

Mills *v.* Hartford HealthCare Corp.

*Opinion*

ECKER, J. This court recently discussed the legality of certain executive orders issued by Governor Ned Lamont in response to the catastrophic effects of the pandemic caused by the spread of the potentially fatal coronavirus disease 2019 (COVID-19). See *Casey* v. *Lamont*, 338 Conn. 479, 481–83, 258 A.3d 647 (2021). The present appeals require us to consider the scope and application of Executive Order No. 7V, which purports to confer immunity on health care providers in connection with Governor Lamont's March, 2020 declaration of a public health emergency.[1] We also must address similar questions with respect to 42 U.S.C. § 247d-6d, a provision in the federal Public Readiness and Emergency Preparedness Act (PREP Act) that confers immunity from suit and liability for injuries sus-

---

[1] Section 6 of Executive Order No. 7V provides in relevant part: "Notwithstanding any provision of the Connecticut General Statutes or any other state law, including the common law, or any associated regulations, rules, policies, or procedures, any health care professional or health care facility shall be immune from suit for civil liability for any injury or death alleged to have been sustained because of the individual's or health care facility's acts or omissions undertaken in good faith while providing health care services in support of the [s]tate's COVID-19 response, including but not limited to acts or omissions undertaken because of a lack of resources, attributable to the COVID-19 pandemic, that renders the health care professional or health care facility unable to provide the level or manner of care that otherwise would have been required in the absence of the COVID-19 pandemic and which resulted in the damages at issue, provided that nothing in this order shall remove or limit any immunity conferred by any provision of the Connecticut General Statutes or other law. Such immunity shall not extend to acts or omissions that constitute a crime, fraud, malice, gross negligence, [wilful] misconduct, or would otherwise constitute a false claim or prohibited act pursuant to [§] 4-275 et seq. of the Connecticut General Statutes or 31 U.S.C. [§] 3729 et seq. . . . The immunity conferred by this order applies to acts or omissions subject to this order occurring at any time during the public health and civil preparedness emergency declared on March 10, 2020, including any period of extension or renewal, including acts or omissions occurring prior to the issuance of this order attributable to the COVID-19 response effort."

The executive order defines the terms "health care professional" and "health care facility." See Executive Order No. 7V, § 6 (April 7, 2020). There is no dispute in the present case that the defendants fall within these terms.

347 Conn. 524 AUGUST, 2023 533

Mills *v.* Hartford HealthCare Corp.

tained as the result of the application or use of certain pandemic countermeasures (e.g., COVID-19 diagnostic tests).[2]

These issues arise in the context of a wrongful death action filed by the plaintiff, Kristen Mills, the daughter of the decedent, Cheryl Mills, and the executor of her estate. The complaint alleges that the decedent died

---

[2] Section 247d-6d of title 42 of the 2018 edition of the United States Code provides in relevant part: "(a) Liability protections

"(1) In general

"Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure.

"(2) Scope of claims for loss

"(A) Loss

"For purposes of this section, the term 'loss' means any type of loss, including—

"(i) death;

"(ii) physical, mental, or emotional injury, illness, disability, or condition;

"(iii) fear of physical, mental, or emotional injury, illness, disability, or condition, including any need for medical monitoring; and

"(iv) loss of or damage to property, including business interruption loss.

"Each of clauses (i) through (iv) applies without regard to the date of the occurrence, presentation, or discovery of the loss described in the clause.

"(B) Scope

"The immunity under paragraph (1) applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure.

* * *

"(d) Exception to immunity of covered persons

"(1) In general

"Subject to subsection (f), the sole exception to the immunity from suit and liability of covered persons set forth in subsection (a) shall be for an exclusive Federal cause of action against a covered person for death or serious physical injury proximately caused by willful misconduct, as defined pursuant to subsection (c), by such covered person. For purposes of section 2679 (b) (2) (B) of title 28, such a cause of action is not an action brought for violation of a statute of the United States under which an action against an individual is otherwise authorized. . . ."

Mills *v.* Hartford HealthCare Corp.

after she was misdiagnosed as having a non-life-threatening heart condition, when she actually was suffering from a life-threatening heart condition. According to the complaint, her death was the result of negligent and grossly negligent medical care provided by the named defendant, Hartford HealthCare Corporation, doing business as Hartford Hospital (hospital), and the defendant physicians, Asad Rizvi, Melissa Ferraro-Borgida, Brett H. Duncan, and William J. Farrell.[3] The defendants moved to dismiss the complaint on the ground that they were immune from suit and liability under Executive Order No. 7V and the PREP Act in light of the role that COVID-19 had played in their diagnosis and treatment decisions. The trial court concluded that the defendants had immunity under Executive Order No. 7V for the allegedly negligent acts and omissions undertaken before the receipt of the decedent's negative COVID-19 test result and immunity under the PREP Act for the allegedly grossly negligent acts and omissions undertaken during that same period. The court consequently granted the motions to dismiss the counts against Rizvi, Ferraro-Borgida, and Duncan. The court further concluded, however, that the only physician responsible for the decedent's care after receipt of the negative test result, Farrell, did not have immunity under either Executive Order No. 7V or the PREP Act. The trial court accordingly denied the motion to dismiss the counts alleging negligence and gross negligence against Farrell.

In SC 20765, the plaintiff appeals from the trial court's judgment insofar as it granted the defendants' motions to dismiss. In SC 20763 and SC 20764, Farrell and the hospital, respectively, appeal from the denial of their

[3] Each count of the complaint is brought against one of the defendant physicians and the hospital. The hospital is being sued only for its derivative liability for the acts of the defendant physicians, its employees or agents (i.e., respondeat superior). We refer in this opinion only to the individual defendants, unless there is a reason to mention the hospital.

Mills *v.* Hartford HealthCare Corp.

motions to dismiss.[4] We disagree with the trial court's conclusions only insofar as it determined that the defendants were entitled to immunity under the PREP Act. We therefore reverse the trial court's judgment dismissing counts V, VI, and VII of the complaint. We affirm the judgment in all other respects.

The following facts are taken primarily from the allegations in the complaint, supplemented by certain additional facts contained in affidavits submitted by the parties in connection with the motions to dismiss. See, e.g., *Carpenter* v. *Daar*, 346 Conn. 80, 97–99 n.12, 287 A.3d 1027 (2023). On the morning of March 21, 2020, the decedent, who worked as a registrar in the emergency room at Backus Hospital (Backus) in Norwich, went to the Backus emergency room complaining of having a sore throat and a headache for the past few days.[5] She informed the staff about her medical history, including the fact that she had a heart murmur and needed a heart valve replacement. She denied feeling any pain in her chest, arm or back, or any shortness of breath at rest. In light of concerning indications on her cardiac monitor, Backus staff had the decedent undergo an electrocardiogram at approximately 12:08 p.m. That test showed rapid atrial fibrillation and an "ST elevation." Theresa Adams, an emergency medicine physician at Backus, suspected that the decedent was experiencing an "ST elevation myocardial infarction" (STEMI) or, in common parlance, a heart attack.

A patient suffering from an acute STEMI should receive coronary intervention in a cardiac catheteriza-

---

[4] The plaintiff, the hospital, and Farrell appealed separately to the Appellate Court. We then transferred the appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1, and consolidated them.

[5] The decedent's medical records also indicate that she told the Backus staff that her granddaughter recently had strep throat and that a rapid strep test was performed on the decedent. The records do not indicate whether the test result was negative, but we presume that to be the case.

Mills *v.* Hartford HealthCare Corp.

tion lab,[6] ideally within ninety minutes. Because Backus did not have the facilities to provide cardiac catheterization, Adams called the hospital, where such facilities are available for both diagnostic and interventional purposes, to arrange for the decedent's transfer.

The hospital had recently modified its protocols due to concerns relating to the spread of COVID-19. One such modification directed health care providers to "avoid admitting patients who were suspected of having COVID-19 to [the hospital's] cardiac catheterization lab . . . until they had tested negative, *unless their physical symptoms dictated the need for emergency catheterization*."[7] (Emphasis added.) The purpose of the modified protocol was to prevent the spread of COVID-19 to other patients and staff and to conserve supplies of personal protective equipment.

At approximately 12:12 p.m., Adams spoke to Rizvi, the interventional cardiologist on call in the hospital's catheterization lab. In light of the notable absence of cardiac symptoms in the decedent's presentation, her medical history, and her high risk of exposure to COVID-19 based on her employment in a hospital emergency room, Rizvi opined that the decedent did not meet the criteria for transfer to the catheterization lab. Rizvi expressed concern that the decedent could have

_____

[6] Cardiac catheterization is a procedure used for various interventional and diagnostic purposes. The standard procedure for an acute STEMI is a "primary percutaneous coronary intervention," in which a balloon is inserted and inflated to remedy blocked blood flow to the heart. See M. Ahmad et al., Percutaneous Coronary Intervention (last updated September 30, 2022), available at https://www.ncbi.nlm.nih.gov/books/NBK556123/ (last visited August 7, 2023).

[7] The defendants neither submitted a written copy of the protocol nor quoted the text of the protocol in any of their affidavits. The quotation in the body of this opinion accompanying this footnote is taken from a statement in the affidavit of Adam Steinberg, the hospital's vice president for medical affairs. That statement is consistent with the description of the protocol in the other defendants' affidavits. There is no indication that the plaintiff disputed the existence of this protocol or its contents.

Mills *v.* Hartford HealthCare Corp.

COVID-19 and doubted that she was suffering from a STEMI. Rizvi recommended that the decedent be transferred to the hospital's emergency room.

Before her transfer from Backus to the hospital at approximately 1:14 p.m., the decedent's troponin levels[8] reached 8.6 nanograms per milliliter, and Backus emergency department staff believed that the decedent was critically ill with a high probability of imminent or life-threatening deterioration. Updated medical information was electronically relayed to Rizvi.

After the decedent's transfer to the hospital, Rizvi examined her and continued to suspect that she was suffering from a COVID-19 induced condition. Rizvi was aware that patients suffering from certain viruses, including COVID-19, could present with an ST elevation and abnormal troponin levels as the result of virus induced myocarditis or myopericarditis, which are non-life-threatening cardiac inflammatory conditions. Rizvi developed a plan for the decedent's treatment, pursuant to which she would be tested for COVID-19, remain in isolation pending receipt of the test result, and undergo an echocardiogram. At approximately 3:27 p.m., Rizvi recommended that admission to the catheterization lab be deferred until COVID-19 could be ruled out.

Hospital staff administered a COVID-19 test to the decedent at approximately 5:18 p.m. on March 21, 2020. It was sent to a state laboratory for processing, which, at that time, took several days.

Over the next two days, March 22 and 23, 2020, Ferraro-Borgida, Duncan, and Farrell, also cardiologists

_____

[8] Troponin is a protein in the blood, which normally "stays inside [the] heart muscle's cells, but damage to those cells—like the kind of damage from a heart attack—causes troponin to leak into [the] blood. Higher levels of troponin in [the] blood also mean[s] more heart damage, which can help [health care] providers determine the severity of a heart attack." Cleveland Clinic, Troponin Test, available at https://my.clevelandclinic.org/health/diagnostics/22770-troponin-test (last visited August 7, 2023).

Mills *v.* Hartford HealthCare Corp.

working at the hospital, became involved in the care of the decedent. Each agreed with Rizvi's recommendation to defer the decedent's transfer to the catheterization lab pending receipt of her COVID-19 test because her history and current presentation indicated to them that she most likely was suffering from COVID-19 related myocarditis. Ferraro-Borgida noted in the decedent's chart that she was not suffering from chest pain but from a sore throat and headache. Ferraro-Borgida also noted that the decedent would need a "full [echocardiogram] for evaluation of valves and cardiac [catheterization] to assess coronary anatomy." Duncan later noted that the decedent "had absolutely no chest symptoms" and that her symptoms were "most consistent with myocarditis." He further noted that they were "[w]aiting for [COVID-19] testing to become negative but [did] suggest cardiac catheterization before hospital discharge." Farrell, the last to examine the decedent on March 23, 2020, noted that she was "asymptomatic with no signs of heart failure or ongoing chest pain." He also noted that, "[o]nce [the decedent has been] ruled out for [a COVID-19] infection she will undergo a right and left heart [catheterization]. [The decedent] is frustrated by the delay but understands the rationale for infectious disease evaluation . . . ."

On March 24, at 7:40 p.m., the decedent's COVID-19 test result was reported as negative. The next morning, on March 25, 2020, at 6:06 a.m., Farrell ordered that the decedent undergo a coronary angiogram in the catheterization lab later that day. The purpose of the angiogram was not to treat an acute STEMI but to evaluate the decedent's coronary anatomy. Before the angiogram could be administered, however, the decedent suffered "a sudden [pulseless electrical activity] arrest" and died. The decedent's death certification listed the cause of death as a myocardial infarction.

Mills *v.* Hartford HealthCare Corp.

The plaintiff thereafter brought this wrongful death action against the defendants pursuant to General Statutes § 52-555. In an eight count complaint, the plaintiff alleged that the individual defendants, and, through them, the hospital, were negligent and grossly negligent in their treatment of the decedent.[9] The defendants filed three separate motions to dismiss: one addressing the counts against Rizvi, one addressing the counts against Ferraro-Borgida and Duncan, and one addressing the counts against Farrell. All of the defendants claimed that they were immune from suit under Executive Order No. 7V because their treatment of the decedent was undertaken in good faith and in support of the state's COVID-19 response and that they were immune under the PREP Act because the treatment was related to a COVID-19 countermeasure.[10] See footnotes 1 and 2 of this opinion. The defendants offered, in support of their motions, affidavits from each of the defendant physicians and from Adam Steinberg, the hospital's vice president for medical affairs, as well as the decedent's hospital records. The plaintiff submitted an affidavit from her medical expert, who attested that the defendant physicians had misdiagnosed the decedent's condition and that the standard, emergency treatment for a STEMI, the condition actually suffered by the decedent, had not changed, regardless of a patient's COVID-19 status.

After the motions to dismiss were filed, the trial court requested additional briefing on the issue of whether receipt of the decedent's negative COVID-19 test result terminated any immunity conferred by Executive Order

---

[9] Counts I though IV alleged negligence respectively against Rizvi, Ferraro-Borgida, Duncan, and Farrell. Counts V though VIII alleged gross negligence respectively against Rizvi, Ferraro-Borgida, Duncan, and Farrell.

[10] The defendants also contended that the plaintiff's claims of gross negligence should be dismissed because they were simply relabeled negligence claims and, therefore, were legally insufficient. The trial court did not address this argument.

Mills *v.* Hartford HealthCare Corp.

No. 7V and the PREP Act. The defendants responded that immunity was not terminated because the treatment decisions made by Farrell after receipt of the negative test result were dictated by the treatment plan put in place when the decedent was admitted to the hospital with a suspected COVID-19 infection. They submitted an additional affidavit by Farrell in support of this claim.

The trial court issued a memorandum of decision, concluding that receipt of the negative COVID-19 test result marked the dividing line between immunity and potential liability. The court reasoned that, "before [the decedent's] COVID-19 test came back negative, the defendants were providing health care services in support of the state's response to the pandemic because, at that time, the defendants had a good faith belief that they may be treating an actual COVID-19 patient." Accordingly, the court concluded that the defendants were immune from suit and liability under Executive Order No. 7V for their allegedly negligent acts or omissions before receipt of the negative test result. The court further concluded that, because "the defendants [could] no longer claim [that] they were 'providing health care services in support of the [s]tate's COVID-19 response' " after receipt of the negative test result, they were not entitled to immunity under the executive order from suit and liability for negligent acts or omissions occurring thereafter.

The trial court reached similar conclusions with respect to immunity under the PREP Act, which, unlike Executive Order No. 7V, provides immunity for gross negligence. The court determined that the PREP Act conferred immunity on the defendants for all acts and omissions, negligent or grossly negligent, occurring before receipt of the negative COVID-19 test result "because such claims plainly are related to, and arise out of, a COVID-19 diagnostic countermeasure, specifi-

Mills *v.* Hartford HealthCare Corp.

cally, [the decedent's] COVID-19 test.'' The court dismissed the claims of gross negligence arising from conduct occurring before the receipt of the test result. As with Executive Order No. 7V, the court concluded that PREP Act immunity did not extend to acts or omissions occurring after receipt of the test result because, ''by that time, [the decedent's] COVID-19 diagnostic tests were at an end.''

To summarize, the trial court granted the defendants' motions to dismiss with respect to the claims directed at the defendants' acts or omissions occurring before 7:40 p.m. on March 24, 2020. The court denied the motions with respect to the claims directed at the defendants' acts or omissions occurring after that time.

The defendants filed motions for clarification, in which they pointed out that there was no dispute that Rizvi, Ferraro-Borgida, and Duncan had not been involved in the decedent's treatment after receipt of the negative COVID-19 test result and, therefore, that the claims against those defendants must or should have been dismissed in their entirety. The plaintiff consented to the motions. The trial court granted the motions and rendered judgment dismissing all of the claims against Rizvi, Ferraro-Borgida, and Duncan, leaving Farrell as the only remaining individual defendant based on his role in the decedent's care after 7:40 p.m. on March 24, 2020.

The plaintiff appealed insofar as the trial court dismissed the counts pertaining to the defendants' acts or omissions before receipt of the decedent's negative COVID-19 test result. Farrell and the hospital separately appealed from the trial court's decision denying in part their motions to dismiss with respect to acts or omissions after receipt of the negative COVID-19 test result.[11]

[11] The decision dismissing all counts against Rizvi, Borgiga-Ferraro, and Duncan is an immediately appealable final judgment. See Practice Book § 61-3. The trial court's denial of the motion to dismiss the counts against Farrell (i.e., counts IV and VIII) is not a final judgment but is nonetheless

Mills *v.* Hartford HealthCare Corp.

Resolution of each of these appeals turns on the question of whether the trial court properly construed and applied the immunity provisions of Executive Order No. 7V and the PREP Act.

Our review of the trial court's decision is guided by well established principles. We previously have recognized that "[t]rial courts addressing motions to dismiss for lack of subject matter jurisdiction pursuant to [Practice Book § 10-30 (a) (1)] may encounter different situations, depending on the status of the record in the case. . . . [I]f [as here] the complaint is supplemented by undisputed facts established by affidavits submitted in support of the motion to dismiss . . . the trial court, in determining the jurisdictional issue, may consider these supplementary undisputed facts and need not conclusively presume the validity of the allegations of the complaint. . . . Rather, those allegations are tempered by the light shed on them by the [supplementary undisputed facts]. . . . If affidavits [or] other evidence submitted in support of a defendant's motion to dismiss conclusively establish[es] that jurisdiction is lacking, and the plaintiff fails to undermine this conclusion with counteraffidavits; see Practice Book § [10-30 (a)]; or other evidence, the trial court may dismiss the action without further proceedings." (Citation omitted; internal quotation marks omitted.) *Carpenter* v. *Daar*, supra, 346 Conn. 98 n.12. Conversely, if the allegations of the complaint and the supplementary facts produced by the defendant do not conclusively establish that jurisdiction is lacking, the court must deny the motion to dismiss. Unless the resolution of the motion to dismiss

immediately appealable under an exception to the final judgment rule for a colorable claim of immunity from suit. See, e.g., *Miller* v. *Egan*, 265 Conn. 301, 303 n.2, 828 A.2d 549 (2003) ("[t]he denial of a motion to dismiss based on a colorable claim of . . . immunity . . . is an immediately appealable final judgment because the order or action so concludes the rights of the parties that further proceedings cannot affect them" (internal quotation marks omitted)).

Mills *v.* Hartford HealthCare Corp.

has required the trial court to resolve factual disputes, our review of a trial court's ruling on a motion to dismiss is plenary. See id., 97, 98 n.12.

I

EXECUTIVE ORDER NO. 7V

We begin with the challenges to the trial court's decision involving the claims of immunity under Executive Order No. 7V. Our first task is to determine the scope of the immunity conferred by the executive order and then to apply that interpretation to the allegations in the complaint and the supplementary undisputed facts.

We have not previously addressed the principles that govern our interpretation of executive orders. The Appellate Court has held that "[a]pplying the principles of statutory interpretation to [an] executive order is [appropriate] because [such an] order has the full force and effect of law." *Prime Management, LLC* v. *Arthur*, 217 Conn. App. 737, 750, 290 A.3d 401 (2023);[12] see General Statutes § 28-9 (b) (1) (any order issued by governor pursuant to § 28-9 (b) "shall have the full force and effect of law upon the filing of the full text of such order in the office of the Secretary of the State"). Other jurisdictions have applied the same reasoning. See *Bassidji* v. *Goe*, 413 F.3d 928, 934 (9th Cir. 2005) ("[a]s is true of interpretation of statutes, the interpretation of an [e]xecutive [o]rder begins with its text"); *United*

---

[12] The Appellate Court in *Prime Management, LLC* v. *Arthur*, supra, 217 Conn. App. 737, further determined that the plain meaning rule set forth in General Statutes § 1-2z applied to its interpretation of an executive order. See id., 750–51. We have some doubt about this conclusion, not only because § 1-2z on its face applies only to statutes, but also because the judicial interpretation of executive orders may involve different considerations than those implicated when we interpret legislation. We need not determine in the present case, however, whether construction of a clear and unambiguous executive order would be subject to the constraints imposed by § 1-2z because, for the reasons set forth subsequently in this part of the opinion, we conclude that Executive Order No. 7V is ambiguous.

Mills *v.* Hartford HealthCare Corp.

*States* v. *Abu Marzook*, 412 F. Supp. 2d 913, 922 (N.D. Ill. 2006) ("[t]he [c]ourt interprets [e]xecutive [o]rders in the same manner that it interprets statutes"); *Coble* v. *Ventura County Health Care Agency*, 73 Cal. App. 5th 417, 425, 288 Cal. Rptr. 3d 431 (2021) ("[t]he construction of an executive order presents an issue akin to an issue of statutory interpretation—one that presumably presents a question of law for our independent review on appeal" (internal quotation marks omitted)); *In re Murack*, 957 N.W.2d 124, 128 (Minn. App. 2021) (applying principles of statutory interpretation to emergency executive orders); *SRI Eleven 1407 Broadway Operator, LLC* v. *Mega Wear, Inc.*, 71 Misc. 3d 779, 795, 144 N.Y.S.3d 289 (2021) ("[a]s is true of interpretation of statutes, the interpretation of an [e]xecutive [o]rder begins with its text, which must be construed consistently with the [o]rder's object and policy" (internal quotation marks omitted)). We find the reasoning of these cases persuasive and, therefore, apply the usual principles of statutory interpretation to our construction of Executive Order No. 7V.

Section 6 of Executive Order No. 7V provides in relevant part: "Notwithstanding any provision of the Connecticut General Statutes or any other state law, including the common law, or any associated regulations, rules, policies, or procedures, any health care professional or health care facility shall be immune from suit for civil liability for any injury or death alleged to have been sustained because of the individual's or health care facility's acts or omissions undertaken in good faith while providing health care services in support of the [s]tate's COVID-19 response, including but not limited to acts or omissions undertaken because of a lack of resources, attributable to the COVID-19 pandemic, that renders the health care professional or health care facility unable to provide the level or manner of care that otherwise would have been required in the

Mills *v.* Hartford HealthCare Corp.

absence of the COVID-19 pandemic and which resulted in the damages at issue . . . .'' This immunity does not extend to, among other things, "acts or omissions that constitute . . . gross negligence . . . .'' Executive Order No. 7V, § 6 (April 7, 2020). The immunity was deemed applicable to acts or omissions occurring at any time during the public health and civil preparedness emergency declared on March 10, 2020.

The sentence conferring immunity contains two basic parts, connected by the phrase "including but not limited to . . . .'' Id. Because the defendants in this case do not claim immunity under the second part of this provision, relating to a lack of resources, we focus our attention primarily on the immunity conferred to covered individuals and facilities for "acts or omissions undertaken in good faith while providing health care services in support of the [s]tate's COVID-19 response . . . .''[13] Id. Moreover, because the plaintiff does not contest the element of good faith, our specific focus is on the requirement that the injury or death be sustained because of the individual's or health care facility's acts or omissions "while providing health care services in support of the [s]tate's COVID-19 response . . . .'' Id. Both sides advance arguments as to why this phrase does or does not apply to the particular facts in the present case, but neither party has clearly articulated

[13] Although the defendants do not claim that they are immune from suit and liability pursuant to the "lack of resources" portion of Executive Order No. 7V, we will nevertheless construe both parts of the provision in this opinion because we must ensure that nothing in the lack of resources portion affects our construction of the first part of the sentence. The immunity is set forth as an integrated whole, and its meaning must be understood as such. "We are obligated to search for a construction of the statute that makes a harmonious whole of its constituent parts." (Internal quotation marks omitted.) *Harpaz* v. *Laidlaw Transit, Inc.*, 286 Conn. 102, 130, 942 A.2d 396 (2008). We also note that the "lack of resources" portion of the executive order is directly at issue in another case that we also decide today. See *Manginelli* v. *Regency House of Wallingford, Inc.*, 347 Conn. 581, 585, A.3d (2023).

Mills *v.* Hartford HealthCare Corp.

a general meaning that they ascribe to the phrase. We therefore consider the broad contours of this phrase before considering the parties' context specific arguments.

The text is reasonably susceptible to a range of reasonable interpretations. The narrowest interpretation would understand the phrase "while providing health care services in support of the [s]tate's COVID-19 response" to mean that a health care provider is immune from suit and liability only for acts or omissions undertaken while treating the injured party for COVID-19. Under the broadest interpretation, the phrase reasonably could mean that a health care provider is immune from suit and liability for any acts or omissions undertaken during the period in which the health care provider is providing services in support of the state's COVID-19 response (i.e., while those services coincide with the effective period of the declared public health emergency), regardless of whether the acts or omissions are connected to those services. Between these two extremes, the phrase also reasonably could mean that immunity applies when the acts or omissions causing the injury were connected to the health care provider's services in support of the state's COVID-19 response, even if the health care provider was not treating the injured party for COVID-19.

Because the immunity provision of Executive Order No. 7V is ambiguous, we look for interpretive guidance to the circumstances surrounding its promulgation and to the public policy that it was designed to implement. Cf. *State* v. *Pond*, 315 Conn. 451, 467, 108 A.3d 1083 (2015) ("[w]hen a statute is not plain and unambiguous, we . . . look for interpretive guidance to the . . . circumstances surrounding its enactment . . . [and] to the legislative policy it was designed to implement" (internal quotation marks omitted)).

The circumstances existing at the beginning of the worldwide COVID-19 pandemic are well known. Although

347 Conn. 524 AUGUST, 2023 547

Mills *v.* Hartford HealthCare Corp.

it was clear by early 2020 that COVID-19 was a dangerous and highly contagious disease, the mechanisms of the disease, its symptomatology, the methods by which the virus spread, and effective strategies for treatment, control, and prevention were all poorly understood. See *Fraihat* v. *United States Immigration & Customs Enforcement*, 16 F.4th 613, 619 (9th Cir. 2021) (observing that steps taken by United States Immigration and Customs Enforcement at outset of pandemic were taken "in the face of scientific uncertainty and a constantly developing understanding of COVID-19"); *United States* v. *Olsen*, 622 F. Supp. 3d 856, 862 (C.D. Cal. 2022) (observing that "COVID-19 [thrust] the world into uncertainty and fear"); *Democratic National Committee* v. *Bostelmann*, 488 F. Supp. 3d 776, 787 (W.D. Wis. 2020) (observing that, as of September, 2020, "[m]uch [was] still unknown about the [COVID-19] virus and the . . . illness that it causes," and that, as of February and March, 2020, "even greater uncertainty surrounded the extent, seriousness and nature of COVID-19"). At this time and at all times relevant to the present case, no COVID-19 vaccine was yet available; see *Dixon* v. *De Blasio*, 566 F. Supp. 3d 171, 177 and nn. 4–7 (E.D.N.Y. 2021), vacated on other grounds, United States Court of Appeals, Docket No. 21-2666, 2022 WL 961191 (2d Cir. March 28, 2022); *Lynch* v. *State*, Superior Court, judicial district of Hartford, Docket No. HHD-CV-16-6067438 (September 11, 2020) (70 Conn. L. Rptr. 221, 221); and the most accurate form of testing for the virus—the type ordered in the present case—typically took several days to obtain results. See T. Li, "Privacy in Pandemic: Law, Technology, and Public Health in the COVID-19 Crisis," 52 Loy. U. Chi. L.J. 767, 812 and nn. 200–201 (2021).

It was widely believed in March, 2020, that medical providers and hospitals throughout the United States were about to be overwhelmed with COVID-19 patients.

Mills *v.* Hartford HealthCare Corp.

See *Lipsey* v. *Walmart, Inc.*, Docket No. 19 C 7681, 2020 WL 1322850, *3 (N.D. Ill. March 20, 2020) (observing that "[the] public record [was] replete with references to the impact that community spread of COVID-19 could have, and [was] already having, on medical care providers, doctors, hospitals and staff"); see id., citing C. Griggs, "A New York Doctor's Coronavirus Warning: The Sky Is Falling," N.Y. Times, March 19, 2020, available at https://www.nytimes.com/2020/03/19/opinion/coronavirus-doctor-new-york.html (last visited August 7, 2023) ("Today, at the hospital where I work, one of the largest in New York City, [COVID-19] cases continue to climb, and there's movement to redeploy as many health care workers as possible to the [emergency rooms], new 'fever clinics' and [intensive care units]. It's becoming an all-healthy-hands-on-deck scenario."), and L. Schenker & D. Heinzmann, "How Illinois Hospitals Are Preparing for a Flood of COVID-19 Patients," Chi. Trib., March 19, 2020, available at https://www.chicago-tribune.com/coronavirus/ct-coronavirus-covid-hospitals-illinois-chicago-20200318-n5vnqva3sng2jnxzgmmljkyybm-story.html (last visited August 7, 2023) ("[m]any [hospitals] have started reassigning medical staff, canceling elective surgeries to save resources, moving testing for COVID-19 outside typical patient areas and drawing up plans for how to house large numbers of patients").[14]

[14] See also *Lipsey* v. *Walmart, Inc.*, supra, 2020 WL 1322850, *3 n.1, citing J. Daley, Like Emergency Medicine Special Forces, Colorado Doctors and Nurses Get Ready To Combat Coronavirus, Colo. Pub. Radio News, March 15, 2020, available at https://www.cpr.org/2020/03/15/like-emergency-medicine-special-forces-colorado-doctors-and-nurses-get-ready-to-combat-coronavirus/ (last visited August 7, 2023) (noting that Colorado "will allow medical professionals licensed in other states to immediately start practicing . . . bring in contract nurses from out of state . . . tap into [medical] students and faculty," and ask "former health workers to consider coming back to work"), J. Lemon, "New York Governor Asks Retired Doctors and Nurses To Sign Up and Be on Call Amid Coronavirus Crisis," Newsweek, March 17, 2020, available at https://www.newsweek.com/new-york-governor-asks-retired-doctors-nurses-sign-call-amid-coronavirus-crisis-1492825 (last visited August 7, 2023) ("New York's Governor Andrew Cuomo called on retired medical professionals to sign up to be on call to respond to the coronavirus pandemic"), and L. Tanner, "US Hospitals Brace for 'Tremendous Strain' from

347 Conn. 524　　　　AUGUST, 2023　　　　549

Mills *v.* Hartford HealthCare Corp.

Confronted with these circumstances, on March 10, 2020, Governor Lamont declared a public health emergency and a civil preparedness emergency throughout the state pursuant to General Statutes §§ 19a-131a and 28-9.[15] See *Casey* v. *Lamont*, supra, 338 Conn. 483. He thereafter issued a series of executive orders, including Executive Orders Nos. 7U and 7V, both of which addressed the health care crisis.[16] Governor Lamont formally declared that it was "necessary to supplement Connecticut's health care workforce and the capacity of health care

New Virus," Associated Press News, March 13, 2020, available at https:// apnews.com/6c9b9686c4af21b9984341d330073979 (last visited August 7, 2023) ("hospitals are setting up . . . triage tents, calling doctors out of retirement, guarding their supplies of face masks and making plans to cancel elective surgery as they brace for an expected onslaught of coronavirus patients").

[15] Section 19a-131a authorizes the governor to declare a public health emergency. Section 28-9 (a) authorizes the governor to declare a civil preparedness emergency, and § 28-9 (b) further provides in relevant part: "(1) Following the Governor's proclamation of a civil preparedness emergency pursuant to subsection (a) of this section or declaration of a public health emergency pursuant to section 19a-131a, the Governor may modify or suspend in whole or in part, by order as hereinafter provided, any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health. The Governor shall specify in such order the reason or reasons therefor and any statute, regulation or requirement or part thereof to be modified or suspended and the period, not exceeding six months unless sooner revoked, during which such order shall be enforced. . . .

\* \* \*

"(7) The Governor may take such other steps as are reasonably necessary in the light of the emergency to protect the health, safety and welfare of the people of the state, to prevent or minimize loss or destruction of property and to minimize the effects of hostile action. . . . "

[16] Executive Order No. 7U contains an immunity provision, § 1, that is identical to the one issued two days later in § 6 of Executive Order No. 7V, except that the latter provision adds language stating that the immunity applies notwithstanding "any other state law, *including the common law* . . . ." (Emphasis added.) Executive Order No. 7V (April 7, 2020). Section 6 of Executive Order No. 7V superseded § 1 of Executive Order No. 7U, but Executive Order No. 7V expressly states that the findings in Executive Order No. 7U retain their effect, as do the remaining provisions. See id. The findings in Executive Order No. 7V are entirely consistent with those in Executive Order No. 7U.

Mills *v.* Hartford HealthCare Corp.

facilities to deliver [lifesaving] care by requesting the assistances of health care professionals who [had] not previously maintained liability coverage; facilitating the deployment of volunteer and out-of-state professionals; and calling [on health care] professionals to perform acts that they would not perform in the ordinary course of business . . . .'' Executive Order No. 7U (April 5, 2020). Governor Lamont further determined that, "in order to encourage maximum participation in efforts to expeditiously expand Connecticut's health care workforce and facilities capacity, there exists a compelling state interest in affording such professionals and facilities protection against liability for good faith actions taken in the course of their significant efforts to assist in the state's response to the current public health and civil preparedness emergency . . . .'' Id. The evident purpose of the immunity provision of Executive Order No. 7V was to facilitate the implementation of these policies by assuring the relevant health care professionals and facilities that, in light of the uncertainties surrounding the diagnosis, treatment, and prevention of COVID-19,[17] and in view of the compelling need to keep health care facilities open and operating, they would not be held liable for such acts and omissions, as long as they acted in good faith and in support of the state's COVID-19 response.

With this background in mind, we first consider the narrowest interpretation of Executive Order No. 7V, under which immunity is available only when the medical practitioner was treating the injured party for COVID-19. We reject this interpretation because it would fall far short of fulfilling the public policy underlying the order. It is not difficult to imagine "good faith actions taken in the course of [health care workers']

---

[17] Prevention of COVID-19 could apply to measures directed at protecting an individual, as well as those directed to society generally or a class of individuals.

Mills *v.* Hartford HealthCare Corp.

significant efforts to assist in the state's response'' to the COVID-19 pandemic that could result in the injury or death of persons who were not being treated for COVID-19. Id. For example, if a patient sought treatment in a hospital's emergency department for a broken leg and contracted a COVID-19 infection from another patient who was being treated for COVID-19, we can perceive no reason why Governor Lamont would have wanted the hospital—which was making a good faith effort to assist in the state's COVID-19 response by treating COVID-19 patients—to be held liable merely because it was not treating the patient with the broken leg for COVID-19. The purpose of Executive Order No. 7V was to allow health care facilities to provide such services without the fear of being subjected to lawsuits.

At the other extreme, we also find unpersuasive an expansive interpretation of Executive Order No. 7V that provides immunity for all negligent acts or omissions undertaken by health care professionals and facilities during the period in which they were providing services in support of the state's COVID-19 response, regardless of the connection between that act or omission and the response to COVID-19. Such immunity would extend to circumstances in which, for example, a patient undergoing a surgical procedure by a fully staffed, equipped, and trained surgical team was injured as a result of the surgeon's negligence. We see no evidence that the governor intended to provide immunity in such circumstances merely because the hospital also was providing services in support of the state's COVID-19 response that had no material effect on the patient's treatment.

Such a broad interpretation would raise other problems, as well. It would run afoul of the principle that "statutes in derogation of the common law are [to be] strictly construed . . . .''[18] (Internal quotation marks

---

[18] We recognize that the plaintiff brought the present lawsuit pursuant to the wrongful death statute, § 52-555. Putting aside the question of whether the plaintiffs' negligence claims would be characterized as purely statutory or

Mills *v.* Hartford HealthCare Corp.

omitted.) *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 789, 865 A.2d 1163 (2005). An immunity that sweeps so broadly also may be of questionable constitutionality on various grounds. For example, when this court addressed the constitutional limits of the authority granted to the governor under § 28-9 (b) in *Casey*, we recognized that the governor's statutory authority under § 28-9 (b) (7) to "take such other steps as are reasonably necessary in the light of [a declared public health] emergency to protect the health, safety and welfare of the people of the state" is constitutional only to the extent that it authorizes the governor to take steps that are necessary to protect the health, safety, and welfare of the people from the dangers "implicated by this particular serious disaster. The governor would not, for example, be able to issue an executive order forbidding restaurants from selling unhealthy foods during the COVID-19 pandemic." (Emphasis omitted.) *Casey* v. *Lamont*, supra, 338 Conn. 508. We explained that, if § 28-9 (b) (7) were interpreted as authorizing the governor to issue executive orders that are not necessary for that narrow purpose, the statute would be an unconstitutional delegation of legislative authority because there would be no limiting principle to guide the exercise of that authority.[19] See id., 504–505. The

common law in derivation; see *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 104–105, 202 A.3d 262, cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto*, U.S. , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019); Executive Order No. 7V, § 6, explicitly applies to both common-law and statutory claims, and we will not assume that the scope of the immunity was intended to shrink or expand depending on whether the plaintiff is asserting a common-law or statutory claim.

[19] A similar concern would arise under § 28-9 (b) (1), which authorizes the governor only to modify and suspend laws, regulations or requirements that are "in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health." A different constitutional concern would arise if an executive order exceeded the limits of the authority conferred by § 28-9 (b)—an unconstitutional usurpation of legislative authority. See, e.g., *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 588–89, 72 S. Ct. 863, 96 L. Ed. 1153 (1952); see also, e.g., *Bayshore Enterprises, Inc.* v. *Murphy*, Docket Nos. A-3616-19 and A-3873-19, 2021

Mills *v.* Hartford HealthCare Corp.

broadest interpretation of Executive Order No. 7V would thus be of questionable constitutionality because, among other reasons, it would not be linked to the specific dangers posed by the COVID-19 pandemic as identified in Executive Order Nos. 7U and 7V, namely, the danger that health care providers and facilities would be unable to meet the expanded demand for services due to liability concerns arising from the use of health care professionals who are not insured or do not have insurance coverage in this state.

The interpretation between these two extremes minimizes the foregoing concerns.[20] An immunity that applies when the acts or omissions that caused the injury are connected to the health care provider's services in support of the state's COVID-19 response, even if the defendant was not treating the injured party for COVID-19, maintains a close fit between the grant of public health emergency authority in § 28-9, the terms of the executive order, and the express policies underlying that order.

We find additional textual support for this interpretation of the first part of the immunity provision when we turn our attention to the second part of that provision. The provision states that the scope of the immunity includes, but is not limited to, "acts or omissions undertaken because of a lack of resources, attributable to the COVID-19 pandemic, that renders the health care professional or heath care facility unable to provide the level or manner of care that otherwise would have been required in the absence of the COVID-19 pandemic and

WL 3120868, *9 (N.J. Super. App. Div. July 23, 2021) (acknowledging that executive order issued in response to COVID-19 pandemic under New Jersey's Emergency Health Powers Act would be "invalid if it usurps legislative authority by acting contrary to the express or implied will of the [l]egislature" (internal quotation marks omitted)).

[20] In part I C of this opinion, we mention other potential concerns regarding the sweep of immunity provided by Executive Order No. 7V.

Mills *v.* Hartford HealthCare Corp.

which resulted in the damages at issue . . . .'' Executive Order No. 7V, § 6 (April 7, 2020). This language plainly requires the act or omission to have a connection to the COVID-19 pandemic for immunity to apply. Construing the first part of the immunity provision to require a similar nexus between the alleged negligence and the COVID-19 pandemic thus creates a harmonious and consistent whole. See, e.g., *Harpaz* v. *Laidlaw Transit, Inc.*, 286 Conn. 102, 130, 942 A.2d 396 (2008) (''[w]e are obligated to search for a construction of the statute that makes a harmonious whole of its constituent parts'' (internal quotation marks omitted)).

Our interpretation also avoids the violation of a basic canon of statutory interpretation that arises from a broad interpretation of the ''while providing health care services'' clause as conferring immunity for any acts or omissions undertaken during the period in which the health care provider is providing services in support of the state's COVID-19 response (i.e., the duration of the public health emergency). If all a defendant has to do to establish immunity under that clause is prove that the pertinent act or omission occurred during the relevant period when it was providing COVID-19 support services, and is not required to establish that the act or omission was connected to the provision of those services, then the specific circumstances that fall within the ''including but not limited to'' clause would be rendered entirely superfluous. See, e.g., *American Promotional Events, Inc.* v. *Blumenthal*, 285 Conn. 192, 203, 937 A.2d 1184 (2008) (''[i]nterpreting a statute to render some of its language superfluous violates cardinal principles of statutory interpretation''). The nature of or reason for the act or omission (a lack of resources or any other relevant reason) would not matter, only when it occurred.

We therefore conclude, subject to the caveat that we articulate in part I C of this opinion, that § 6 of Executive

Mills *v.* Hartford HealthCare Corp.

Order No. 7V confers immunity from suit and liability only for acts and omissions that are undertaken in good faith and in connection with the provision of such services. Health care services in support of the state's COVID-19 response necessarily would include those undertaken for the prevention, diagnosis, or treatment of COVID-19. The language of the immunity provision and the policies the immunity is expressly intended to advance require a defendant to demonstrate a nexus between the alleged negligence and the services rendered in support of the state's COVID-19 response. Mindful of these broad contours of the part of the immunity provision at issue, we now turn to the parties' arguments as to its application to the present circumstances.

A

The plaintiff contends in her appeal that the trial court should not have found against her as to the events prior to receipt of the negative COVID-19 test result because COVID-19 is irrelevant to the negligence alleged in her complaint, which rests on her claim that the defendants caused the decedent's death as a result of their misdiagnoses of her medical condition and their corresponding failure to render proper treatment. The plaintiff asserts that, "but for the misdiagnosis, [the decedent's] COVID-19 status would have been considered irrelevant, and the fact that she was experiencing a STEMI would have compelled the defendants to get her into the [catheterization] lab quickly." The plaintiff accepts that this misdiagnosis could have been a product of the defendants' subjective, good faith belief that the decedent likely was suffering from a COVID-19 induced heart condition. She contends, however, that the defendants would be entitled to immunity only if they *reasonably* believed that the decedent's COVID-19 status was relevant to her diagnosis and treatment. The plaintiff argues on the basis of this premise that

Mills *v.* Hartford HealthCare Corp.

the defendants cannot establish that the acts or omissions at issue were undertaken "while providing health care services in support of the [s]tate's COVID-19 response" for two related reasons: (1) under the hospital's COVID-19 protocol, the determination of whether a patient was exhibiting physical symptoms dictating the need for *emergency* catheterization was made without regard to the patient's COVID-19 status, and (2) in the absence of undisputed evidence proving otherwise, the court was bound to assume the truth of the plaintiff's allegations that the defendants misdiagnosed the decedent with myocarditis or myopericarditis rather than a STEMI, and, thus, the delay in her transfer to the catheterization lab for an emergency procedure was not connected to the provision of health services in support of the state's COVID-19 response.[21] We disagree.

The plaintiff has offered no evidence to call into dispute the defendants' affidavits attesting that the decedent's COVID-19 status was a material factor in their diagnosis of the decedent and their decisions on her treatment and care. The defendants recommended a COVID-19 test to confirm or cast doubt on that diagnosis. Although the defendants' immunity does not hinge on the existence of the hospital's COVID-19 protocol, the fact that they deferred the decedent's admission to the catheterization lab in reliance on that protocol underscores the fact that their acts or omissions, negligent or not, occurred while providing health care services in support of the state's COVID-19 response. The aim of that protocol was to protect patients from expo-

_____

[21] The plaintiff claims that, if she is not entitled on the present record to reversal of that portion of the trial court's decision against her, we should remand the case for an evidentiary hearing on the issue of whether the defendants' misdiagnosis was objectively reasonable. The plaintiff has not directed this court's attention to anywhere in the record where she made such a request to the trial court. In any event, we reject the request in light of our conclusion that immunity does not depend on whether the defendants' misdiagnosis was objectively reasonable.

Mills *v.* Hartford HealthCare Corp.

sure to the potentially deadly virus and to conserve scarce personal protective equipment necessary to protect desperately needed staff. The diagnosis and treatment of a patient with health care complications that the health care provider believed in good faith to be caused by COVID-19, as well as the prevention of the spread of COVID-19 to other patients, clearly constitute acts or omissions connected to the provision of health care services in support of the state's COVID-19 response.

The plaintiff's argument that the immunity provision requires an objectively reasonable belief that the defendants' provision of services is in support of the state's COVID-19 response suffers from three principal flaws, two legal and one factual in nature. First, although the provision expressly imposes a good faith requirement, it says nothing about the objective reasonableness of that belief. Cf. General Statutes § 33-756 (a) ("[e]ach member of the board of directors, when discharging the duties of a director, shall act: (1) [i]n good faith; and (2) in a manner the director reasonably believes to be in the best interests of the corporation"). Second, the defendants' argument collapses the distinction between immunity and liability by conflating two very different issues, namely, (1) whether the defendants are immune for their allegedly negligent acts and omissions, and (2) whether the defendants were in fact negligent. Under the plaintiff's theory, the immunity would never be necessary because a court could not determine that the defendants are entitled to immunity unless it also finds that there is no negligence (i.e., when the act or omission at issue was found to be objectively reasonable and, thus, no liability would attach). Third, and most important, the plaintiff's position fails to appreciate that, in the present case, the alleged misdiagnosis and the decedent's COVID-19 status were inextricably intertwined—the defendants submitted undisputed evi-

Mills *v.* Hartford HealthCare Corp.

dence that they believed that the decedent's symptoms were *caused* by COVID-19, and their treatment plan (including the delay in transferring her to the catheterization lab) was informed by that provisional diagnosis.

The plaintiff contends that it is necessary to require proof that the defendants' misdiagnosis was objectively reasonable because, otherwise, any defendant could avoid liability in any case simply by asserting their subjective, but unreasonable, belief that a patient had COVID-19. This concern carries little weight. It ignores the requirement of good faith, which may be disputed in some cases (but is not in the present case). It also overlooks the fact that there will be situations in which a patient's COVID-19 status will be irrelevant to the care and treatment at issue. There will, in addition, be cases in which a patient alleges that the defendants' acts or omissions constitute gross negligence or wilful misconduct, both of which are outside the scope of the immunity afforded under the executive order.

Mindful of the caveat we articulate in part I C of this opinion, we conclude that the trial court properly dismissed the counts alleging negligence for acts or omissions occurring before receipt of the decedent's negative COVID-19 test result (i.e., counts I, II, and III of the complaint).

B

Farrell and the hospital claim in their appeals that the trial court incorrectly determined that the immunity conferred by Executive Order No. 7V does not apply to Farrell's acts and omissions after the receipt of the decedent's negative COVID-19 test result. They contend that the treatment that Farrell provided after that time was dictated entirely by the treatment that had been prescribed when the decedent was initially admitted to the hospital, and nothing that they could have done after receipt of the test result could have prevented

Mills *v.* Hartford HealthCare Corp.

the decedent's death. More particularly, the hospital contends that Governor Lamont did not "intend for frontline health care professionals to be sued for adhering to a plan dictated by COVID-19 and put in place before they ever saw the patient. Such results would be inconsistent with Governor Lamont's purposes to encourage providers to take whatever action [was] needed to combat the pandemic and to expand the health care workforce because it would discourage participation rather than encourage it and encourage wasteful, defensive medicine." Farrell likewise contends that "it would be incongruous to interpret the scope of the executive order as being limited solely to the care and treatment of patients [who] test positive for COVID-19. . . . If the governor meant to limit the scope of immunity to the treatment of COVID-19 positive patients only, he could have done so but chose not to as a policy matter." We disagree.

Under the circumstances of this case, receipt of the test result broke any meaningful connection between Farrell's treatment of the decedent and his provision of health care services in support of the state's COVID-19 response. At that point, Farrell simply was providing treatment to a patient who, three days earlier, had received test results possibly indicating a STEMI. Although the clinical diagnosis of a possible COVID-19 infection had caused the delay in diagnosing and treating the decedent's true condition, COVID-19 had no bearing on the nature of the health care services that were rendered after 7:40 p.m. on March 24, 2020. Therefore, immunity was no longer available under the terms of Executive Order No. 7V.

Farrell and the hospital dispute this conclusion, arguing that COVID-19 did bear on the nature of the health care services that Farrell provided after receipt of the negative COVID-19 test. They argue that Farrell's treatment of the decedent was entirely dictated by the

Mills *v.* Hartford HealthCare Corp.

treatment decisions that were made when the decedent was admitted to the hospital with a clinical diagnosis of possible COVID-19. To support this claim, they rely on Farrell's affidavit, in which he stated that his order at 6:06 a.m. on March 25, 2020, directing that the decedent be admitted to the catheterization lab, "was not a new treatment decision and plan, but rather was [the] completion of the treatment plan established on March 21, 2020, dictated as a result of COVID-19 concerns of myocarditis simulating a STEMI presentation and concerns of COVID-19 exposure and spread risk," and that, "[a]s of the time of [his] care and treatment, the initial event, whatever it was, was a completed event." Farrell further contends that, by the time the defendants received the negative test result, there was no treatment that they reasonably could have been expected to provide that would have reversed the completed cardiac event that the decedent had suffered on March 21, 2020, or prevented her death.

Neither of these arguments is persuasive. First, the decisions that were made concerning the decedent's treatment once COVID-19 was ruled out were not "dictated by" the clinical COVID-19 diagnosis but, rather, were the result of learning that the decedent did not have COVID-19 and the delay driven by suspicion of a COVID-19 induced condition having come to an end. COVID-19 had no apparent bearing on the treatment of the decedent's heart condition as of 7:40 p.m. on March 24, 2020. Second, with respect to the contention that the defendants are immune from suit and liability for Farrell's acts and omissions occurring after the receipt of the negative test result because there was nothing that he reasonably could have been expected to do at that point to prevent the decedent's death, the claim conflates immunity with liability by arguing, in effect, that they are immune because Farrell was not negligent.[22]

_____

[22] In her brief in the defendants' appeals, the plaintiff vigorously denies that the record establishes that the defendants could not reasonably have

Mills *v.* Hartford HealthCare Corp.

As we previously explained in part I A of this opinion, the immunity conferred by Executive Order No. 7V does not turn on whether the defendants' acts or omissions were negligent but on whether their acts or omissions had a connection to health care services provided in support of the state's COVID-19 response. There is no such connection with respect to events after receipt of the negative COVID-19 test.

Farrell contends that our conclusion would lead to an absurd result because he provided care for the decedent both before and after receipt of the test, and it makes no sense to bifurcate the immunity analysis under these circumstances. He points out that, "[a]lthough the [trial] court found that . . . Farrell had immunity for following the established plan of care put in place [when] he became involved in the case, it also [found] that he did not have immunity for following that same established plan of care after receipt of the negative COVID-19 test." This contention overlooks that the facts changed upon receipt of the test result. Once COVID-19 was ruled out as a cause of the decedent's heart condition, the treatment of her heart condition going forward was not being provided in support of the state's COVID-19 response and, therefore, was not within the scope of the immunity conferred by Executive Order No. 7V. Moreover, contrary to the premise of Farrell's contention, the plaintiff is seeking to hold the defendants liable for the acts that they actually undertook or failed to undertake in treating the decedent, not for devising a treatment plan for what would happen if the decedent received a negative COVID-19 test result. Regardless of who initially devised the treatment plan in the event that the result came back negative, Farrell was the physician who provided the treatment, and the plaintiff

been expected to do anything more than they did after the receipt of the negative COVID-19 test result to prevent the decedent's death. We need not resolve this question because the dispute relates to liability, not immunity.

Mills *v.* Hartford HealthCare Corp.

seeks to hold him liable for his failure to provide the treatment allegedly required by the applicable standard of care.[23]

Taking a different tack, the hospital argues that the defendants are entitled to immunity because the hospital's COVID-19 protocols hampered the defendants' ability to provide treatment to the decedent after receipt of her negative COVID-19 test result. The hospital relies on Steinberg's statements in his affidavit that, "[d]uring the [t]reatment [p]eriod, [the hospital] was engaged in various steps to conserve personal protective equipment . . . including, but not limited to, minimizing in-person contact between patients and hospital personnel and limiting the number of hospital personnel in contact with patients suspected of having COVID-19," and that the hospital's COVID-19 protocols required it to "avoid administration of echocardiograms to patients who did not demonstrate an absolute clinical need . . . ." There is no support in the record establishing that the factors identified by Steinberg played any role in hampering the defendants' treatment of the decedent after receipt of the negative COVID-19 test result. None of the affidavits includes any such statement of fact.[24]

[23] Farrell's contention that his treatment plan for the decedent, after receipt of the test results, was a reasonable one given the long passage of time since she initially suffered an acute cardiac event goes to the question of liability, not immunity; so, too, does his contention that his treatment plan for the decedent conformed to the one endorsed by the other defendant physicians.

[24] In response to the plaintiff's assertion that the defendants could have ordered an echocardiogram after receipt of the negative COVID-19 test result, the hospital claims that the defendants could not have done so because its COVID-19 protocol precluded that procedure in the absence of an "absolute clinical need . . . ." (Emphasis omitted; internal quotation marks omitted.) The record does not establish conclusively either that an echocardiogram was the only reasonably possible treatment for the decedent's condition at that time or that she did not have an absolute clinical need for one. The hospital also suggests that the defendants were required to assume that the decedent suffered from COVID-19, even after receipt of the negative test result. It is undisputed that all of the physicians who treated the decedent contemplated that her treatment plan would change if she

Mills *v.* Hartford HealthCare Corp.

For the foregoing reasons, we conclude that the trial court correctly determined that Farrell and, through him, the hospital are not immune from suit and liability under Executive Order No. 7V for the plaintiff's claims related to the health care services that they provided to the decedent after receipt of her negative COVID-19 test result. It therefore properly denied Farrell's motion to dismiss on that ground.

C

We end our discussion regarding immunity under Executive Order No. 7V with an important caveat. Our role in the present appeal is limited to interpreting and applying Executive Order No. 7V to the undisputed facts. Although the parties have cited constitutional consider-ations in connection with their arguments as to the *scope* of immunity afforded under Executive Order No. 7V, the plaintiff has not challenged on appeal the gover-nor's statutory or constitutional authority to confer immunity from liability for medical malpractice in the first place.[25] Cf. *Casey* v. *Lamont*, supra, 338 Conn. 483 (holding that § 28-9 provided authority for governor to issue certain executive orders and that statute so construed passed constitutional muster). Given the common-law nature of an action for medical malprac-tice; see, e.g., *Greenwald* v. *Van Handel*, 311 Conn. 370, 383, 88 A.3d 467 (2014); *Golden* v. *Johnson Memorial Hospital, Inc.*, 66 Conn. App. 518, 534–36, 785 A.2d 234, cert. denied, 259 Conn. 902, 789 A.2d 990 (2001); it remains an open question whether § 28-9 (b) (1), which

tested negative for COVID-19, presumably because they believed that a negative result would indicate that COVID-19 was not the cause of her symptoms.

[25] The plaintiff did raise a claim in the trial court that affording immunity to the defendants in the present case would violate the open courts provision of the state constitution. See Conn. Const., art. I, § 10. The trial court con-cluded that this provision was inapplicable because the plaintiff's claims were brought pursuant to the wrongful death statute, § 52-555, and the plaintiff did not challenge that determination on appeal.

Mills *v.* Hartford HealthCare Corp.

authorizes the governor to "modify or suspend" a "stat-ute, regulation or requirement," permits the issuance of an executive order modifying or suspending the "common law," as Executive Order No. 7V purports to do. See footnote 15 of this opinion (setting forth rele-vant text of § 28-9 (b)). This omission naturally raises a colorable question as to whether the legislature in fact delegated such authority to the governor, and, if not, whether any other source of authority supported the order as to this matter. See F. Perry & M. Weismann, "Rationing Healthcare During a Pandemic: Shielding Healthcare Providers from Tort Liability in Uncharted Legal Territory," 30 U. Miami Bus. L. Rev. 142, 174–79 (2021) (discussing whether gubernatorial executive orders providing immunity shields raise enforceability issues, including whether state governor is legally authorized to issue executive order). Mindful that the resolution of these issues not only would impact liability arising from the COVID-19 pandemic but also could provide useful guidance for responses to potential future public health emergencies, we solicited supple-mental briefs on whether this court could and should address these important matters.[26] The parties and the

---

[26] This court invited amici curiae to file briefs in the present case and a related case, *Manginelli* v. *Regency House of Wallingford, Inc.*, 347 Conn. 581, A.3d (2023); see footnote 13 of this opinion; to address the following questions, on which the parties were ordered to submit supplemen-tal briefs:

"1. Does this case present an exceptional circumstance for this court to invoke its authority under [*Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*], 311 Conn. 123, 84 A.3d 840 (2014), to raise and decide the issues identified below, which were not addressed by the parties?

"2. If the answer to the first question is 'yes,' does the governor have the authority under . . . § 28-9 (b) (1) or (7) and/or *Casey* v. *Lamont*, [supra, 338 Conn. 479], to suspend the common law?

"3. If the answer to the second question is 'no,' what was the source of the governor's authority to enact [§] 6 of Executive Order [No.] 7V?

"4. Under . . . § 28-9 (b) (1) or (7) and/or *Casey* . . . does the governor have the authority to create and confer immunity through an executive order?"

Mills *v.* Hartford HealthCare Corp.

responding amici curiae naturally took different views on this matter.

Although these questions are of a sufficiently "public character" to warrant this court initiating review; (emphasis omitted) *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 158, 84 A.3d 840 (2014); we have determined that their resolution should await more appropriate circumstances. It is evident that the limitations of supplemental briefing in this case do not afford a sufficiently robust platform to address the legal issues raised sua sponte by the court, including, but not limited to, whether medical malpractice in a wrongful death action should be characterized as statutory or common law in nature; see *Soto* v. *Bushmaster Firearms International, LLC*, 331 Conn. 53, 104–105, 202 A.3d 262 (explaining that wrongful death statute does not create new cause of action and acknowledging derivative nature of wrongful death action), cert. denied sub nom. *Remington Arms Co., LLC* v. *Soto*, U.S. , 140 S. Ct. 513, 205 L. Ed. 2d 317 (2019); whether such immunity would violate the open courts provision of article first, § 10, of the state constitution; see *Lohnes* v. *Hospital of Saint Raphael*, 132 Conn. App. 68, 80–81, 31 A.3d 810 (2011) (addressing whether statutory condition for bringing medical malpractice action violated open courts provision), cert. denied, 303 Conn. 921, 34 A.3d 397 (2012); see also footnote 25 of this opinion; and whether the common law could be abrogated through the modification or suspension of statutes, especially when § 6 of Executive Order No. 7V does not identify any statutes or indicate that it intends to "modify" or "suspend" any existing law, as directed in § 28-9 (b) (1). Cf. Executive Order No. 7V, §§ 2 through 5 (April 7, 2020) (identifying statutes to be "modified" and specifying nature of modification). We also are mindful of the concern that the posture of the present case failed to afford a sufficient

Mills *v.* Hartford HealthCare Corp.

opportunity for the development of an evidentiary record that might be required for this court to properly adjudicate these issues at this stage. Accordingly, in our analysis of the issue as presented to us, we have assumed, without deciding, that the governor was legally authorized to create and confer the immunity at issue in the present case, as provided in § 6 of Executive Order No. 7V, and leave the resolution of that question to another day.

II

FEDERAL PREP ACT

The question that remains is whether the plaintiff's claims that do not come within the scope of Executive Order No. 7V nonetheless must be dismissed under the immunity provision of the federal PREP Act. The specific claims at issue are the count alleging negligence against Farrell relating to treatment following receipt of the negative COVID-19 test result, addressed in part I B of this opinion, and the counts alleging gross negligence as to all the defendants.[27] As we will explain, the scope of the immunity provided by the PREP Act is different from—and much narrower than—that conferred by Executive Order No. 7V and does not cover the claims presently under consideration.

"Congress enacted the PREP Act in 2005 [t]o encourage the expeditious development and deployment of medical countermeasures during a public health emergency by allowing the [United States Secretary of Health and Human Services (secretary)] to limit legal liability for losses relating to the administration of medical countermeasures such as diagnostics, treatments, and vaccines." (Internal quotation marks omitted.) *Cannon* v. *Watermark Retirement Communities, Inc.*, 45 F.4th

---

[27] The immunity conferred by Executive Order No. 7V does not cover gross negligence. See Executive Order No. 7V, § 6 (April 7, 2000).

Mills *v.* Hartford HealthCare Corp.

137, 139 (D.C. Cir. 2022). "The immunity is triggered by a declaration from the [s]ecretary identifying the threat to public health, the period during which immunity is in effect, and other particulars." Id.

The PREP Act provides in relevant part that "a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss *caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure* if a declaration . . . has been issued with respect to such countermeasure."[28] (Emphasis added.) 42 U.S.C. § 247d-6d (a) (1) (2018). The immunity conferred by the PREP Act "applies to any claim for loss that has *a causal relationship with the administration to or use by an individual of a covered countermeasure*, including a causal relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure." (Emphasis added.) 42 U.S.C. § 247d-6d (a) (2) (B) (2018).

On March 10, 2020, the secretary issued a declaration under the PREP Act in response to the COVID-19 pandemic. See Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15,198 (March 17, 2020) (PREP Act declaration). Although the PREP

[28] There is no claim in the present case that the defendant physicians are not covered persons under the PREP Act. See 42 U.S.C. § 247d-6d (i) (2) (B) (iv) (2018) (defining "covered person" to include "a qualified person who prescribed, administered, or dispensed such countermeasure"); 42 U.S.C. § 247-6d (i) (8) (A) (2018) (defining "qualified person" to include "a licensed health professional or other individual who is authorized to prescribe, administer, or dispense such countermeasures under the law of the State in which the countermeasure was prescribed, administered, or dispensed").

Mills *v.* Hartford HealthCare Corp.

Act does not define "administration of covered counter-measures," the PREP Act declaration defines that term to include both the "physical provision of the counter-measures to recipients" and "activities and decisions directly relating to public and private delivery, distribu-tion and dispensing of the countermeasures to recipi-ents . . . [and] management and operation of countermeasure programs . . . ." Id., 15,200. The sec-retary subsequently amended the PREP Act declaration for various purposes. The amended declaration defines "covered countermeasures" for COVID-19 to include "[a]ny antiviral, any drug, any biologic, any diagnostic, any other device, any respiratory protective device, or any vaccine manufactured, used, designed, developed, modified, licensed, or procured . . . [t]o diagnose, mit-igate, prevent, treat, or cure COVID-19 . . . ."[29] Elev-enth Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medi-cal Countermeasures Against COVID-19, 88 Fed. Reg. 30,769, 30,774 (May 12, 2023) (amended PREP Act decla-ration); see id., 30,774–75 (incorporating PREP Act's definition of "administration of covered counter-measures").

There is no dispute in the present case that the COVID-19 diagnostic test administered to the decedent on March 21, 2020, constitutes a covered countermea-sure for purposes of PREP Act immunity. Nor is there any claim that any other covered countermeasure was employed. The issue that we must decide is whether the decedent's death was a loss "caused by, arising out of, relating to, or resulting from the administration to or the use by an individual" of that covered countermea-

---

[29] The liability protections provided by the amended PREP Act declaration are retroactive to March 10, 2020, the date that Governor Lamont declared a public health emergency. See Eleventh Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Counter-measures Against COVID-19, supra, 88 Fed. Reg. 30,775.

Mills *v.* Hartford HealthCare Corp.

sure under the PREP Act. 42 U.S.C. § 247d-6d (a) (1) (2018).

The construction and application of the PREP Act present an issue of statutory interpretation subject to plenary review. "With respect to the construction and application of federal statutes, principles of comity and consistency require us to follow the plain meaning rule . . . . Under the [federal] plain meaning rule, [l]egislative history and other tools of interpretation may be relied [on] only if the terms of the statute are ambiguous. . . . If the text of a statute is ambiguous, then we must construct an interpretation consistent with the primary purpose of the statute as a whole. . . . Thus, our interpretive process will begin by inquiring whether the plain language of [the] statute, when given its ordinary, common meaning . . . is ambiguous. . . . In assessing ambiguity, the meaning of the statute must be evaluated not only by reference to the language itself but also in the specific context in which that language is used, as well as in the broader context of the statute as a whole." (Citations omitted; internal quotation marks omitted.) *Soto* v. *Bushmaster Firearms International, LLC*, supra, 331 Conn. 117–18.

Application of the PREP Act to the COVID-19 pandemic has been explored by many federal and state courts, and, although most of those decisions are inapposite, a few provide useful guidance in the present case. The purpose of the PREP Act, as supplemented by the amended PREP Act declaration, was to encourage covered providers to implement covered countermeasures as quickly and broadly as reasonably possible without fear of liability. See *Estate of Maglioli* v. *Andover Subacute Rehabilitation Center I*, 478 F. Supp. 3d 518, 529 (D.N.J. 2020) ("The PREP Act, as amended, is an emergency response to the pandemic. Its evident purpose is to embolden caregivers, permitting them to administer certain encouraged forms of care (listed

Mills *v.* Hartford HealthCare Corp.

COVID-19 'countermeasures') with the assurance that they will not face liability for having done so.''), aff'd sub nom. *Estate of Maglioli* v. *Alliance HC Holdings, LLC*, 16 F.4th 393 (3d Cir. 2021).

In determining whether PREP Act immunity applies in a given case, courts focus on the claims of the plaintiff, as pleaded in the complaint. See, e.g., *Coleman* v. *Intensive Specialty Hospital, LLC*, Docket No. 21-0370, 2022 WL 17779323, *4 (W.D. La. December 19, 2022) (defendant could not assert immunity under PREP Act when, ''as plead[ed], the claim concern[ed] a failure to follow prescribed treatment predating any COVID-19 diagnosis''); *Levert* v. *Montefiore Home*, Docket No. 1:21-cv-02312, 2022 WL 4591253, *4 (N.D. Ohio September 30, 2022) (''The [c]omplaint merely referencing [COVID-19] testing . . . is not the equivalent of alleging improper use or administration of [COVID-19] diagnostic tests. . . . Thus, it cannot be said that [the] [d]efendants' fake test results related to the administration of a covered countermeasure.'' (Internal quotation marks omitted.)), aff'd, Docket No. 22-3876, 2023 WL 4536093 (6th Cir. July 13, 2023); *Acra* v. *California Magnolia Convalescent Hospital, Inc.*, Docket No. EDCV-21-898-GW-SHKx, 2021 WL 2769041, *6 (C.D. Cal. July 1, 2021) (defendants were not entitled to immunity under PREP Act when, contrary to defendants' claim, plaintiffs did not ''base their claims on [the defendants'] purchasing, administration, dispensing, prescribing, distribution and use of countermeasures, such as facemasks and other [personal protective] and testing equipment to prevent or mitigate the spread of COVID-19'' (internal quotation marks omitted)), aff'd, Docket No. 21-55813, 2023 WL 4105198 (9th Cir. June 21, 2023); *Gunter* v. *CCRC OPCO-Freedom Square, LLC*, Docket No. 8:20-cv-1546-T-36TGW, 2020 WL 8461513, *4 (M.D. Fla. October 29, 2020) (''[The] [p]laintiff does not assert any theory of liability that is in any way related to the

Mills *v.* Hartford HealthCare Corp.

[d]efendants' physical provision of any countermeasure. Thus, the [c]ourt concludes [that the] [p]laintiff's claims do not fall within the scope of the PREP Act . . . .'' (Internal quotation marks omitted.)); *Whitehead* v. *Pine Haven Operating, LLC*, 75 Misc. 3d 985, 991, 170 N.Y.S.3d 855 (2022) (''[t]he PREP Act applies, and preempts state claims and confers immunity, only where the allegations are that the defendant dispensed or administered countermeasures improperly, causing injury'').

Existing case law also makes it clear that the immunity conferred by the PREP Act, as it relates to what constitutes a covered countermeasure, is narrow in scope and far less encompassing than the immunity conferred by Executive Order No. 7V. See *Estate of Maglioli* v. *Andover Subacute Rehabilitation Center I*, supra, 478 F. Supp. 3d 532–33 (contrasting New Jersey executive order, which, like Connecticut's, provides immunity from civil liability for any damages alleged to have been sustained ''as a result of an act or omission undertaken in good faith in the course of providing services in support of the [s]tate's COVID-19 response,'' with immunity under PREP Act, which ''is far narrower'' (emphasis omitted; internal quotation marks omitted)). The PREP Act applies *only* to the ''administration'' of a *covered countermeasure.* 42 U.S.C. § 247d-6d (a) (1) (2018). Although ''administration of the covered countermeasure'' is defined broadly to include both the ''physical provision of the countermeasures to recipients'' and ''activities and decisions directly relating to public and private delivery, distribution, and dispensing of the countermeasures to recipients . . . [and] management and operation of countermeasure programs''; Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, supra, 85 Fed. Reg. 15,200; unlike Executive Order No. 7V, the PREP Act does not apply to all medical services provided in an attempt to diagnose, treat, or

prevent the spread of COVID-19. See *Estate of Maglioli* v. *Andover Subacute Rehabilitation Center I*, supra, 533 ("[t]he drafters of the PREP Act, if they had meant to cover any negligent act or omission in the course of providing [COVID-19 related] health care, could easily have done so" (internal quotation marks omitted)).

In particular, and importantly, countermeasures do not include protocols or policies designed or implemented for the prevention or control of COVID-19. See *Crupi* v. *Heights of Summerlin, LLC*, Docket No. 2:21-cv-00954-GMN-DJA, 2022 WL 489857, *6 (D. Nev. February 17, 2022) ("[A]n infection control program or COVID-19 response policy is not a covered countermeasure. To put it simply, a program or policy is not a product, drug, or device."), aff'd, Docket No. 22-15413, 2023 WL 4105306 (9th Cir. June 21, 2023); *Whitehead* v. *Pine Haven Operating, LLC*, supra, 75 Misc. 3d 991 (nursing home COVID-19 protocols, such as social distancing, restricting visitors, requiring residents and staff to wear face coverings, screening staff and visitors, and discontinuing group activities, did "not amount to the administration of countermeasures under the PREP Act").

A

We first address the plaintiff's appeal insofar as it challenges the trial court's dismissal of the claims alleging gross negligence, in particular those counts relating to acts or omissions prior to receipt of the test results on the evening of May 24, 2022. With respect to those allegations, the trial court concluded that "[t]he gravamen of the [plaintiff's] claim is that the defendants delayed [the decedent's] care for a heart attack because the defendants mistakenly thought [the decedent] had COVID-19. The reason why the defendants thought [the decedent] had COVID-19 . . . arose out of and was related to the fact that they were awaiting the results of a COVID-19 diagnostic test, a covered countermeasure

347 Conn. 524 AUGUST, 2023 573

Mills *v.* Hartford HealthCare Corp.

under the PREP Act.'' (Internal quotation marks omitted.) Accordingly, the trial court concluded that the defendants were immune under the PREP Act from suit and liability for their conduct, including grossly negligent acts or omissions, occurring before receipt of the test results. We disagree with the trial court's reasoning and reverse this aspect of its decision.

The allegations in the complaint control our analysis. The plaintiff alleged in her complaint, among other things, that the individual defendants were grossly negligent in that they (1) ''failed to timely diagnose [the decedent] with a myocardial infarction,'' despite various test results that were indicative of that condition, (2) ''failed to immediately transfer [the decedent] to the cardiac catheterization lab'' for treatment and ''caused an unreasonable delay in delivering proper care and treatment to [the decedent],'' and (3) ''failed to properly monitor [the decedent], and left her alone in her room when [they] knew or should have known she was suffering from a life-threatening condition.'' The plaintiff did *not* allege that the decedent's death was caused by the defendants' improper administration, prescription, dispensing, or use of the COVID-19 test. The plaintiff's claim, instead, is that the defendants were grossly negligent because they failed to diagnose the decedent as suffering from a STEMI and because, even if they reasonably believed that the decedent's symptoms were caused by COVID-19, they failed to admit her immediately to the catheterization lab.[30] We concluded in part

_____

[30] The plaintiff did not specifically allege in her complaint that the defendants were grossly negligent when they failed to admit the decedent immediately to the catheterization lab, *even if they reasonably believed that her symptoms were being caused by COVID-19*, because she did not preemptively anticipate the defendants' immunity defense. We must read the complaint broadly in her favor, however, and we cannot conclude at this stage of the proceedings that she would be precluded from attempting to establish at trial that the standard of care requires immediate admission to the catheterization lab of any patient who presents with STEMI symptoms, even if some other cause is suspected, in light of the severe consequences of a delay in a definitive diagnosis.

Mills *v.* Hartford HealthCare Corp.

I of this opinion that the clinical COVID-19 diagnosis and the hospital's COVID-19 protocol, which resulted in the delayed approval for the decedent's admission to the catheterization lab, were subject to the immunity provision of Executive Order No. 7V because they were undertaken in good faith and in support of the state's COVID-19 response. Neither the COVID-19 diagnosis nor the protocol, however, was a covered countermeasure under the PREP Act. See, e.g., *Crupi* v. *Heights of Summerlin, LLC*, supra, 2022 WL 489857, *6; *Whitehead* v. *Pine Haven Operating, LLC*, supra, 75 Misc. 3d 991.

We recognize that the delay in treatment attendant to the COVID-19 test may in fact have had a causal relationship to the decedent's death. Indeed, if the processing of the test had been instantaneous or taken little time—a matter beyond the defendants' control— the decedent might well have been admitted to the catheterization lab immediately, which may have saved her life (or, regardless of the outcome, eliminated the claim of malpractice). But the mere fact that the defendants administered and used a COVID-19 test did not, in and of itself, dictate whether they should or should not proceed with treatment while the test result was pending. That decision was driven by the defendants' clinical COVID-19 related diagnosis and the hospital's catheterization lab protocol. There would have been no delay attributable to the defendants if they had immediately diagnosed her STEMI or, despite suspecting that she suffered from COVID-19, had immediately admitted her to the catheterization lab while the COVID-19 test result was pending, as the plaintiff alleges they should have done.[31] Thus, *as alleged by the plaintiff*, the gross

[31] Although not directly on point, the decision of the federal District Court in *Haro* v. *Kaiser Foundation Hospitals*, Docket No. CV 20-6006-GW-JCx, 2020 WL 5291014 (C.D. Cal. September 3, 2020), is instructive. In *Haro*, the plaintiff claimed that the defendant had required its hourly employees to arrive at least fifteen minutes before the start of their work shift so that they could undergo screening for COVID-19. Id., *1. The plaintiff sought

Mills *v.* Hartford HealthCare Corp.

negligence resulting in the decedent's demise was not causally related to, did not arise out of, and was not related to the administration or use of the COVID-19 test within the meaning of the PREP Act.

The decision of the federal District Court in *Goins* v. *Saint Elizabeth Medical Center*, Docket No. 22-91-DLB-CJS, 2022 WL 17413570 (E.D. Ky. November 9, 2022), is instructive on this point. In that case, the plaintiff alleged that she developed certain health issues after she received a COVID-19 vaccine. Id., *1. She further alleged that, as a result of these health issues, she was required to undergo multiple surgeries and other courses of treatment, in the course of which several of the defendants committed medical malpractice. Id., *1–2. The defendants contended that the plaintiff's claims were preempted by the PREP Act. Id., *4. The District Court concluded that PREP Act immunity did not apply to the plaintiff's medical malpractice claims arising from the defendants' alleged negligence after she received the COVID-19 vaccine because, although the plaintiff alleged that the administration of the vaccine was a cause of her injuries, "none of her claims [against the particular defendants who provided medical care to the plaintiff after she received the COVID-19 test], and most importantly, none of the facts asserted

compensation for this time. Id. The defendant contended that it was immune from suit and liability for this claim under the PREP Act. Id. The court concluded that the plaintiff's wage claim was "not causally connected to the screening procedures themselves, but rather the requirement that employees show up [fifteen] minutes before their shifts start. [The defendant] could just as easily have implemented the screenings without the requirement that employees show up early. In that case, the screening procedures would simply have occurred while employees were on the clock and [the plaintiff] would not have a [minimum wage] claim." (Emphasis omitted.) Id., *3. Similarly, in the present case, if the defendants had diagnosed the decedent with a suspected STEMI and admitted her to the catheterization lab while the COVID-19 test results were pending (as the plaintiff's complaint, read broadly in her favor, alleges they should have done), the pending COVID-19 test would have had no impact on the care that they provided to the decedent.

Mills *v.* Hartford HealthCare Corp.

alongside her claims, make[s] allegations regarding [those defendants'] prescription, administration, or dispensation of the vaccine.''[32] Id., *8. The District Court's analysis in *Goins* recognizes that the fact that a covered countermeasure may have been a cause of the plaintiff's injuries does not mean that a defendant is entitled to immunity under the PREP Act if the plaintiff has alleged that the defendant engaged in tortious conduct that constituted a distinct and independent cause of the plaintiff's injuries that itself has no causal relationship to the countermeasure. Put another way, there is no immunity for medical malpractice that does not involve the administration or use of a countermeasure, even if the countermeasure was employed during the plaintiff's treatment and had a distinct and independent causal relationship with the loss. See id. (PREP Act immunity did not apply because *Goins* was ''an ordinary malpractice suit brought under Kentucky law, by a Kentucky plaintiff, against Kentucky defendants''); see also *Estate of Maglioli* v. *Andover Subacute Rehabilitation Center I*, supra, 478 F. Supp. 3d 532 (PREP Act ''leaves room for ordinary claims of negligent or substandard care'' relating to diagnosis and treatment of COVID-19); *Wilhelms* v. *ProMedica Health System, Inc.*, 205 N.E.3d

---

[32] The specific issue addressed by the court in *Goins* was whether the defendants who treated the plaintiff in that case after she received the vaccine were ''covered persons'' for purposes of the PREP Act. See *Goins* v. *Saint Elizabeth Medical Center*, supra, 2022 WL 17413570, *7–8. The court concluded that they were not because the plaintiff made no allegation that they prescribed, administered or dispensed the COVID-19 vaccine. See id.; see also 42 U.S.C. § 247d-6d (i) (2) (B) (iv) (2018) (defining ''covered person'' to include ''a qualified person who prescribed, administered, or dispensed such countermeasure''). As framed by the plaintiff in the present case, the issue is not whether the defendants are covered persons, but whether the complaint alleges that the death has a causal relationship with the administration to or use by an individual of a covered countermeasure. Accordingly, we do not address the question of whether any or all of the defendants were covered persons under the PREP Act. The *Goins* analysis nonetheless supports the plaintiff's position here because of the overlapping analyses of these issues under the language of the statute.

Mills *v.* Hartford HealthCare Corp.

1159, 1166 (Ohio App.) (mere fact that countermeasure was employed during treatment of COVID-19 did not mean that plaintiff's "loss or injuries [were] caused [by] arose out of, related to, or resulted from the administration of or the use of the [countermeasure]"), appeal denied, 170 Ohio St. 3d 1420, 208 N.E.3d 855 (2023).

The foregoing analysis leads us to conclude that the PREP Act does not provide immunity from suit and liability for losses arising from the defendants' treatment of the decedent before the receipt of the negative COVID-19 test result.

The defendants urge us to reach a contrary result in reliance on the decision of the United States District Court for the District of New Mexico in *Storment* v. *Walgreen, Co.*, Docket No. 1:21-cv-00898 MIS/CG, 2022 WL 2966607 (D.N.M. July 27, 2022).[33] In *Storment*, the plaintiff alleged that she received a COVID-19 vaccination at the defendant pharmacy. Id., *1. She became dizzy after receiving the vaccine and saw no chairs in the pharmacy that would allow her to sit until the symptoms passed. Id. She sustained injuries after falling as the result of her dizziness. Id. The defendant claimed

[33] The defendants also cite a number of cases that do not involve the PREP Act for the proposition that the phrase "arising out of," as used in the PREP Act; 42 U.S.C. § 247d-6d (a) (1) (2018); should be interpreted broadly. See *Ford Motor Co.* v. *Montana Eighth Judicial District Court*,
U.S. , 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (construing phrase "arise out of or relate to the defendant's contacts with the forum," as used in court's personal jurisdiction jurisprudence (emphasis omitted; internal quotation marks omitted)); *United States* v. *Shearer*, 473 U.S. 52, 54–55, 105 S. Ct. 3039, 87 L. Ed. 2d 38 (1985) (construing phrase "[a]ny claim arising out of assault [or] battery," as used in portion of Federal Tort Claims Act, as excepting such claims from waiver of sovereign immunity (internal quotation marks omitted)); *Nationwide Mutual Ins. Co.* v. *Pasiak*, 327 Conn. 225, 242–54, 173 A.3d 888 (2017) (construing phrase "arising out of," as used in insurance policies). These cases provide minimal guidance because they do not involve the PREP Act. In our view the plaintiff's claims do not "arise out of" the administration of the COVID-19 test to the decedent, regardless of the breadth of that term.

Mills *v.* Hartford HealthCare Corp.

that it was immune from suit and liability for the plaintiff's injuries under the PREP Act. Id. The District Court concluded that, although "[t]his chain of events [was] unfortunate and certainly deserving of a remedy . . . it [could not] be divorced from the administration of a covered countermeasure—the COVID-19 vaccine [that the plaintiff] received." Id., *3. Accordingly, the court held that the defendants in *Storment* were immune from suit and liability under the PREP Act. Id.

*Storment* is not on point because the plaintiff in that case alleged that her injury was attributable to the improper administration of a covered countermeasure—a COVID-19 vaccine. See id., *1. As we explained, the plaintiff in the present case does not allege that the decedent's death was caused by, arose out of, or was related to the improper administration or use of the COVID-19 test but claims that the defendants were grossly negligent when they failed to diagnose her STEMI and to admit her immediately to the catheterization lab. Moreover, application of the immunity conferred by the PREP Act in *Storment* advanced the purpose of the legislation, namely, to allow medical providers to provide COVID-19 vaccines quickly and broadly to the public without fear of being held liable for any injuries attributable to them. If the plaintiff is able to prove her allegations, no comparable policy is advanced by the defendants' conduct in the present case.

B

We next address the defendants' appeal challenging the trial court's determination that the PREP Act does not provide immunity from the claims against Farrell and the hospital involving events after they received the decedent's negative COVID-19 test result. The trial court reasoned that receipt of the test result broke the connection between the test and the medical treatment

347 Conn. 524 AUGUST, 2023 579

Mills *v.* Hartford HealthCare Corp.

provided to the decedent after the result became known. We concluded in part II A of this opinion that the PREP Act does not confer immunity from suit and liability for the allegedly negligent conduct of Rizvi, Ferraro-Borgida, and Duncan before the receipt of the decedent's negative COVID-19 test result. A fortiori, the PREP Act does not provide immunity for the allegedly negligent conduct of Farrell and the hospital *after* receipt of the test result. If, as we have concluded, there is no allegation of any causal relationship between the administration of the COVID-19 test and the plaintiff's allegations of negligence before receipt of the test result for purposes of the PREP Act, the receipt of the test result could not have created such a connection. Indeed, the defendants do not claim otherwise; they claim only that the trial court incorrectly determined that the receipt of the test result *broke* the connection between the administration of the test and their allegedly negligent conduct. We therefore uphold the determination of the trial court that Farrell and the hospital are not immune from suit and liability under the PREP Act for their allegedly negligent conduct occurring after receipt of the negative COVID-19 test on this alternative ground.

Finally, we pause to comment on a superficial but ultimately illusory tension that may be perceived between our analysis under the PREP Act, in which the delay associated with the COVID-19 testing of the decedent does not trigger any immunity, and our analysis under Executive Order No. 7V, in which we conclude that the defendants are entitled to immunity for the period of time before the test result became known. The difference in outcome arises because the respective immunities are different in scope. Immunity under the PREP Act hinges on there being a connection between the allegedly tortious conduct and the administration or use of a "covered countermeasure." No such relationship exists in the present case because the alleged mis-

Mills *v.* Hartford HealthCare Corp.

diagnosis occurred irrespective of the administration or use of the COVID-19 test, the only countermeasure at issue. The administration and use of the COVID-19 test was not tortious. Nor did the ensuing delay cause the only alleged tortious conduct, i.e., the misdiagnosis. The mere fact that a covered countermeasure was administered at some point does not, without more, entitle a defendant to immunity under the PREP Act.[34] Immunity under Executive Order No. 7V, by contrast, hinges on the existence of a nexus between the alleged misdiagnosis and the defendants' provision of services in support of the state's COVID-19 response. Those services plainly include the defendants' diagnosis of a COVID-19 related condition, regardless of whether that diagnosis was, as the plaintiff claims, the result of negligence. The defendants' alleged misdiagnosis in the present case was itself the provision of services in support of the state's COVID-19 response, thus triggering the immunity for the period of time when that diagnosis remained operative.

In light of our conclusions in parts I and II of this opinion, the plaintiff is entitled to proceed on the counts alleging gross negligence against all of the defendants and the count alleging negligence against Farrell and the hospital. The defendants' arguments as to whether the allegations are legally sufficient to support gross negligence; see footnote 10 of this opinion; are matters properly resolved by the trial court in further proceedings.

[34] To illustrate this point, assume hypothetically that the COVID-19 test had been administered at Backus, before the defendants' involvement, but the result thereafter was relayed to the defendants. In this scenario, the defendants would not be immune under the PREP Act because their alleged negligence—their misdiagnosis of a COVID-19 related condition—has no causal relationship to the COVID-19 test performed earlier by some other caregiver. By contrast, the defendants would be immune under Executive Order No. 7V, until the test result came back, because the alleged malpractice occurred in connection with diagnostic services provided by the defendants in support of the state's response to COVID-19.

The decision of the trial court is reversed in part insofar as it dismissed counts V, VI, and VII of the complaint and the case is remanded with direction to deny the motions to dismiss with respect to those counts and for further proceedings according to law; the decision of the trial court is affirmed in all other respects.

In this opinion the other justices concurred.

———————————————